OPINION OF THE COURT
Eve Preminger, J.
At issue is the intriguing question whether to admit in evidence the testimony of a witness whose memory was refreshed by hypnosis prior to trial. Defendant moves to preclude Charles Morris, a witness for the prosecution from testifying about a meeting six years earlier during which defendant asked him to witness the final arrangements for a contract murder. Morris’ recollection of the details of the alleged meeting was dim until he underwent hypnosis during the course of police questioning over one year ago. Defendant asserts that the methods used to stimulate Mr. Morris’ memory were overly suggestive, and that such use of hypnosis deprives defendant of his constitutional right of cross-examination. The People contend that the jury must determine for itself the weight to be *232 accorded the testimony of a witness who has been hypnotized.
The past 10 years have seen a dramatic rise in the use of hypnotism as an aid in criminal investigations. Descriptions, details, and occurrences that have been forgotten or assimilated into the unconscious mind of a traumatized witness may be summoned up by putting the witness into a relaxed, trance-like state. Often meeting with dazzling success, this technique facilitated the apprehension of the Boston Strangler, the arrest of a suspect in the murder of a Metropolitan Opera cellist, and the rescue of 26 kidnapped California schoolchildren; and it has figured in the solution of numerous less-celebrated crimes as well. (See Hypnotism vs. Crime: A Powerful Weapon — Or an Abused Tool?, New York Times, Oct. 14, 1980, § C 1.) Hypnotism may indeed be the only way in some cases to retrieve memories of such particulars as the numbers on a license plate, the color of a car or an article of clothing, or a distinctive physical feature of an alleged assailant.
Regrettably, as useful a pretrial investigative procedure as hypnotism may be, it carries with it inescapable dangers when introduced into the trial setting. The reliability of statements uttered by a person under hypnosis is not susceptible of measurement. A subject of hypnosis is likely to be highly suggestible, eager to supply answers to questions whether or not those answers are a result of actual memories. The desire to please the hypnotist and the receipt of psychological “cues” unwittingly communicated by the hypnotist or others present during the hypnosis may trigger pseudomemories. In that event, the subject relating such a pseudomemory will be entirely persuaded of its veracity. A resolution adopted by the Executive Council of the Society for Clinical and Experimental Hypnosis (Oct. 19, 1978) states: “Because we recognize that hypnotically aided recall may produce either accurate memories or at times may facilitate the creation of pseudo memories, or fantasies that are accepted as real by subject and hypnotist alike, we are deeply troubled by the utilization of this techniques [sic] among the police. It must be emphasized that there is no known way of distinguishing with certainty between actual recall and pseudo memories except *233 by independent verification”. (People v Hughes, 99 Misc 2d 863, 868.)
In short, a person under hypnosis may offer two types of replies to questions he is asked: (1) truthful statements based upon information recalled through the process of hypnotism; and (2) “confabulations,” or fictional statements, created to fill memory gaps. The latter are distinguishable from lies and are potentially more of an impediment to the discovery of truth. A person lying, whether under hypnosis or not, will know he is lying, whereas a person confabulating will be absolutely convinced he is telling the truth. Neither he nor his hypnotist will be able to differentiate between a truthful statement and a pseudomemory. This circumstance may render a witness immune to meaningful cross-examination, since his belief in his own honesty is generally unshakeable. Hypnosis is therefore capable of producing both a witness able to describe actual events with precision and one able to testify with complete conviction and sincerity to events that never happened.
Courts consequently face a dilemma that is arising more and more frequently in criminal trials. On the one hand, they are aware that the use of hypnosis in police investigations often yields spectacular results and invaluable witnesses. On the other hand, they are cognizant of the intrinsic problems respecting the truthfulness of statements made under hypnosis.
The dilemma is often compounded at trial by the production of expert witnesses who offer conflicting opinions about the reliability of the hypnotically induced memories of a given witness. For example, in United States v Narciso (446 F Supp 252, 280), Dr. Martin Orne, a psychiatry professor at the University of Pennsylvania and an expert on hypnosis, testified that the witness in question had received “unconscious cues and suggestions communicated * * * by the FBI agents conducting the interrogation.” Dr. Herbert Spiegal, a psychotherapist and teacher of hypnosis at Columbia College of Physicians and Surgeons, testified (p 280) that the same witness was “a person of low hypnotizability *** not unduly subject to suggestion while in the hypnotic state”.
*234 The various jurisdictions dealing with whether or not to admit evidence derived from hypnosis have thus far handled the problem in three ways: (1) total exclusion; (2) admission for all purposes, on the premise that hypnosis bears on credibility of testimony rather than admissibility; and (3) admission provided that the hypnotism procedures used have complied with specified safeguards intended to increase the reliability of posthypnosis testimony.
The “total exclusion” rule has been established in at least two States. The Supreme Court of Minnesota, in State v Mack (_Minn_,_, 292 NW2d 764, 769), articulating many of the concerns discussed above, observed: “In addition to its historical unreliability, a ‘memory’ produced under hypnosis becomes hardened in the subject’s mind. A witness who was unclear about his ‘story’ before the hypnotic session becomes convinced of the absolute truth of the account he made while under hypnosis. This conviction is so firm that the ordinary ‘indicia of reliability’ are completely erased, and hypnotic subjects have been able to pass lie detector tests while attesting to the truth of statements they made under hypnosis which researchers know to be utterly false. It would be impossible to cross-examine such a witness in any meaningful way.” These misgivings led the court to its conclusion (p_, p 771) that, “[r]egardless of whether such evidence is offered by the defense or by the prosecution, a witness whose memory has been ‘revived’ under hypnosis ordinarily must not be permitted to testify in a criminal proceeding to matters which he or she ‘remembered’ under hypnosis.”
Similarly, in State v La Mountain (125 Ariz 547, 551 [en banc]), the Supreme Court of Arizona, while acknowledging that hypnosis may be a useful investigative tool, stated: “we do not feel the state of the science (or art) has been shown to be such as to admit testimony which may have been developed as a result of hypnosis.” It, too, held (p 551) that “[a] witness who has been under hypnosis, as in the case here, should not be allowed to testify when there is a question that the testimony may have been produced by that hypnosis.”
There is some indication that Oklahoma may also follow the rule of exclusion. While not deciding the precise ques *235 tian of whether or not to admit the testimony of a witness who had undergone hypnosis, the court in Jones v State (542 P2d 1316 [Okla]) refused to admit expert testimony regarding the truthfulness of exculpatory statements made by the accused while under hypnosis. In rejecting this offer of proof, the court likened the hypnotic process to lie detector or truth serum tests (p 1326), which tests “have not attained sufficient scientific and psychological accuracy nor general recognition as being capable of definite and certain interpretation.” (See, also, People v Blair, 25 Cal 3d 640; Greenfield v Commonwealth, 214 Va 710.)
Courts embracing the second approach defined above have admitted hypnosis-related evidence on the theory that the hypnotism of a witness is just one of many factors that a jury must weigh in assessing the credibility of the witness. Doubts as to the witness’ reliability or credibility may be raised during cross-examination. (See Clark v State, 379 So 2d 372, 376 [Fla] [“The state was entitled to have the jury weigh all of the circumstances relating to the hypnosis in determining the credibility they would attach to the post-hypnotic identification”]; State v Jorgensen, 8 Ore App 1 [credibility of witnesses who “were subjected to prolonged and rigorous cross-examination” as to testimony given in open court; but see State v Harris, 241 Ore 224, 242, was for the jury]; see, also, Collier v State, 244 Ga 553; State v McQueen, 295 NC 96; State v Exum, 138 NC 599.) Federal courts, too, have declined to hold testimony based on hypnotically refreshed memories inadmissible as a matter of law. (See United States v Adams, 581 F2d 193, 199; Kline v Ford Motor Co., 523 F2d 1067, 1069; United States v Narciso, 446 F Supp 252, supra.)
Selecting a middle road, the courts of several States have enumerated safeguards to be observed by those conducting the hypnosis, in order to reduce the potential unreliability of statements produced. New York has perhaps gone the farthest in delineating these precautions. In People v Lewis (103 Misc 2d 881) the court, citing Warner (The Use of Hypnosis in the Defense of Criminal Cases, 27 Int J of Clinical and Experimental Hypnosis 417), specified nine safeguards: (1) the hypnotic session should be administered by a mental health expert trained in hypnosis; (2) the *236 hypnotist, in order to be kept unbiased, should be informed by written memorandum of only those facts of the case that would be essential for questioning the subject; (3) the hypnotist should be a neutral party, unconnected with either side of the case; (4) the entire hypnotic session should be video taped; (5) no one connected with either side of the case should be present during the session; (6) prior to the session, the subject should be examined by a mental health professional to assure that the subject suffers from no mental or physical disorder and is competent to understand the procedure he will undergo; (7) prior to hypnosis, the hypnotist should obtain from the subject a detailed description of the facts as then remembered; (8) the hypnotist should attempt to avoid adding any elements to the subject’s prehypnosis description and should take special care not to convey any cues before, during or after hypnosis; and (9) evidence corroborative of or contradictory to statements made during the trance should be considered.
These guidelines were explicitly adopted and examined at length in People v McDowell (103 Misc 2d 831, 836), which also emphasized the importance of independent verification of the statements made under hypnosis.
The propounding of safeguards implies that a “totality of the circumstances” judgment as to the suggestiveness of the procedure used in a given case is to be made by the trial court in its discretion. (See People v Hughes, 99 Misc 2d 863, supra.) (For examples of the “safeguard” approach in other jurisdictions, see People v Smrekar, 68 Ill App 3d 379 [in determining that testimony was admissible, court considered that hypnosis was conducted by a competent physician, that no suggestion was evidence in the process, and that statement was corroborated]; State v Temoney, 45 Md App 569, 580 [“no evidence whatsoever *** that the procedure used was suggestive”]; Harding v State, 5 Md App 230 [court looked to hypnotist’s professional credentials, exposure of the hypnosis procedure, and corroboration]; State v Hurd, 173 NJ Super 333.)
There is no question that most of the Lewis and McDowell safeguards were lacking in the instant case.[1] That *237 conclusion, however, does not end the matter. This case presents two significant considerations not entirely encompassed by the enumerated safeguards. First, Mr. Morris’ pre and posthypnosis statements are substantially similar, which must always be a central factor in a determination of the reliability of posthypnosis testimony. Second, this case offers a most unusual feature: defendant’s own expert witness testified that Mr. Morris, while undergoing hypnosis, was either feigning or was not in a suggestible state. Such a claim clearly undercuts any assertion that the procedures used, even if suggestive, in fact created pseudo-memories. Indeed if Mr. Morris had feigned a trance, the risks normally associated with hypnosis would have been virtually absent, because Mr. Morris would not have been susceptible to cues that might have been imparted during the hypnotism. His statements, therefore, would be as reliable (or unreliable) as those made without the benefit of hypnosis.
As the instant case illustrates, the fact patterns involving hypnosis are too complex and varied to adopt any absolutist position on admissibility. The judgment in each case must turn upon an assessment of the reliability of the posthypnosis testimony, after weighing all of the factors and their relationship to each other. Such case-by-case scrutiny is most likely to obtain the benefits available from hypnosis while avoiding its innate hazards. In light of the particular features mentioned above, this court does not believe that Morris should be precluded from testifying.
Permitting Morris to testify does not resolve all issues raised by the hypnotic session in which he participated. Morris’ testimony concerns events which he claims occurred over six years ago, about which he has given a number of oral and written statements through the years. These statements, while not inconsistent with his proposed trial testimony, are far less detailed and indicate an inability to recall most specific details. Defendant correctly points out that this variance would ordinarily be a powerful weapon on cross-examination, as he could challenge the now-remembered details as recent fabrications. He fears, however, that this weapon will be turned against him if the People are able to inform the jury that Morris has recalled *238 details because he was hypnotized. He requests a ruling precluding the People from alluding to the hypnosis.
The chief defense in this contract murder case is that Morris, the People’s major witness, has invented his entire story of being summoned by defendant to meet the hired killers and witness the murder contract. The importance of what happens on cross-examination cannot be overstated.
If the People are allowed to demonstrate that the details of Morris’ testimony were “remembered” during hypnosis, there is a danger that a lay jury, unfamiliar with the pitfalls of hypnosis, will suspend its critical faculties and unhesitatingly accept the testimony because of the erroneous, but common, belief that persons under hypnosis do not lie. On the other hand, if the People are precluded from revealing the hypnosis, defendant’s attack on the testimony as a recent fabrication would be similarly, and unfairly, invulnerable.
Defendant’s suggested solution of preclusion misperceives both the problem and the appropriate remedy. The difficulty arises not because of the suggestiveness of the hypnotic session or the lack of safeguards used, but because of the vast gap between the public perception of hypnosis and the scientific fact. This can only be remedied by education of the jury, by expert testimony if defendant chooses, and by appropriate instructions from the court. Therefore, if defendant chooses to attack Morris’ improved memory, the People will be permitted to show that Morris allegedly went through hypnosis, leaving to defendant the right to-attempt to discredit both the hypnotic session and its results. The court will instruct the jury as to the inherent dangers in all posthypnosis testimony and the particular hazards present here because of the failure to adhere to the appropriate safeguards (cf. People v Diaz, 53 AD2d 587).
Defendant’s motion to suppress is denied, subject to the conditions set forth above.[2]

. Among other flaws, the session, though recorded, was not video taped, and was administered by a police department hypnotist in the presence of detectives directly involved in the investigation.

. The court wishes to express its gratitude to Debra Groisser, a Columbia Law School student, for her research assistance.