# LEON COLLINS *v.* STATE OF MARYLAND

[No. 1583, September Term, 1981.]

*Decided July 13, 1982.*

The cause was argued before GILBERT, C. J., and LISS, J., and PHILIP M. FAIRBANKS, Associate Judge of the Sixth Judicial Circuit, specially assigned.

*Arthur A. DeLano, Jr.,* and *Isaac S. Kershner, Assistant Public Defenders,* with whom was *Alan H. Murrell, Public Defender, on the brief,* for appellant.

*William C. Rogers, III, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Joseph E. Moore, State's Attorney for Worcester County,* on the brief, for appellee.

LISS, J., delivered the opinion of the Court.

Leon Collins, appellant, was charged in the Circuit Court for Worcester County with the first-degree murder of Olivia Collins, his wife. The case was originally tried before a jury on January 16, 1981. Upon submission of the issues to the jury it was unable to agree upon a verdict and a mistrial was declared on January 21, 1981. Appellant's motion to dismiss on the basis of double jeopardy was denied by the trial court. Appellant was subsequently tried and convicted of first-degree murder. Sentence was imposed and it was from the judgment that this appeal was filed. Appellant raises six issues to be determined by this appeal:

> 1. Did the lower court err in denying appellant's motion to suppress extrajudicial statements that were not voluntarily made pursuant to a valid waiver of the privilege against self-incrimination and of the right to an attorney's presence?
> 2. Did the lower court err in denying appellant's

motion to suppress extrajudicial statements obtained during an unreasonable delay in presenting appellant before a judicial officer in violation of MDR 723a?

3. Was appellant deprived of his constitutional right to a speedy trial?

4. Did the lower court err in admitting hypnotically induced testimony?

5. Did the lower court err in permitting a police officer to testify before the jury that he had been informed that the appellant shot his wife?

6. Did the lower court commit reversible error in failing to provide appellant an opportunity to be present at a critical stage of his trial?

## 1.

A pretrial hearing was conducted by the trial court on the motion to suppress certain statements elicited by police from appellant. Trooper Hornung of the Maryland State Police Department testified that on July 16, 1980, at approximately 12:30 a.m., he had received a report that Olivia Collins, appellant's wife, had been shot by her husband at a truck stop on Route 13, south of Pocomoke, Maryland. He further testified that the victim's whereabouts were unknown and that the appellant's unoccupied vehicle, with a rifle in the front seat, had been sighted by a trooper at another truck stop adjacent to the truck stop where the incident had occurred. Trooper Hornung proceeded to the appellant's home and took him into custody. Appellant testified that he was sleeping when he was awakened by a telephone call from the police informing him that his house was surrounded by police and ordering him to come out on the porch with his hands up. Trooper Hornung and two other officers advanced on the appellant with their service weapons drawn and appellant was patted down and taken into the house. Trooper Hornung stated he read the appellant his *Miranda* warning when he took appellant into custody at approximately 1:00 a.m. Appellant stated that he understood them. Appellant denied

being advised of his rights until he was taken to the Snow Hill, Maryland jail at approximately 12:20 p.m. on July 16, but, in any case, he acknowledged being given the *Miranda* warnings and does not contend that he did not understand them.

Immediately after the Trooper advised appellant of his *Miranda* rights, the Trooper testified that the following occurred:

> "I [Trooper Hornung] asked [appellant] if he was willing to talk to me about his wife, and he indicated that he certainly was. And I said, 'Where is she?', and he said that he assumes that she was home and claimed not to have any other knowledge of her. He told me that he had been separated, I believe he said, for four months or so.
>
> I then asked him if he owned a weapon, and he said, yes, he had a rifle and it was in the bedroom. And he turned and walked to the bedroom and I followed him. And in the corner behind the dresser he had a .22 caliber rifle. As I recall, the stock was up and the barrel to the floor standing in the corner.
>
> He reached back and picked that up and I immediately took it from him."

The Trooper then questioned appellant for approximately 45 minutes. All the officers who participated in the questioning of the appellant at one time or another testified that no promises or threats were made. The record makes it clear that the questioning concerned itself almost exclusively with the whereabouts of the appellant's wife. Appellant assured the officers he wanted to help locate his wife and responded to all questions about where she might be. At about 7:00 a.m., Trooper Hurnung took the appellant to the Snow Hill police station where one Trooper Thomas spoke to him. During his conversation with Trooper Thomas, appellant said he was tired and was permitted to nap for about a half hour. When he awoke, Trooper Thomas spoke to the appellant for about 45 minutes to an hour. Essentially the

same questions were asked by Thomas as had been asked by Hornung, *i.e.,* concerning Olivia's whereabouts and whether appellant killed her. This was acknowledged by appellant, in his testimony in support of the motion to suppress. Appellant further acknowledged that he was never handcuffed, beaten or threatened and that he never made any request of the police that was refused. Appellant ultimately told the officer that he could visualize his wife at a truck stop, driving through water near a boat ramp. Based on this information, appellant, in the company of Troopers Thomas and Hornung, was taken to the municipal boat ramp. When nothing was found at that location, appellant next suggested they look at the boat ramp behind the Campbell Soup plant. There the police found tire tracks leading to the water which appellant stated looked like tracks which could have been made by his wife's vehicle. Appellant was then taken before a Commissioner at approximately 12:30 p.m. and charged with attempted murder. Two days later, appellant's wife was found in her car, in the Pocomoke River, near the boat ramp. It is admitted by the State and the appellant that the *Miranda* warnings were given to the appellant only at the time he was originally taken into custody and that appellant indicated he understood the rights.

Appellant relies primarily on *Brown v. State,* 6 Md. App. 564, 252 A.2d 272 (1969), to support his claim that he did not validly waive his *Miranda* rights. Waiver of these rights may be shown expressly or by the attendant circumstances. *See North Carolina v. Butler,* 441 U.S. 369, 60 L.Ed.2d 286 (1979); *Leuschner v. State,* 45 Md. App. 323, 413 A.2d 227 (1980). *Cf. Swain v. State,* 50 Md. App. 29, 435 A.2d 805 (1981). There is no requirement that there be a statement by an accused that he fully understands and waives his rights.

We have carefully considered *Brown, supra,* and find it distinguishable on the facts from the case at bar. In *Brown,* this Court was in accord with the cases that held that the *Miranda* warnings need not be given anew and that the *Miranda* waiver need not be expressed each time the officers question an accused. *See Miller v. United States,* 396 F.2d 492 (8th Cir. 1968); *State v. Davis,* 157 N.W.2d 907 (Iowa

1968). In *Brown,* we concluded that the admission of an appellant's written confession was reversible error where, although he had been given the *Miranda* warnings the night before, his statement on the following day was given to different interrogators at a police barracks some 50 miles away from the scene of the prior interrogation without any further *Miranda* warnings or a waiver thereof.

The facts are substantially different in the case at bar. There is not the slightest doubt that the *Miranda* warnings were properly given when the appellant was taken into custody. The record substantiates that appellant acknowledges having been given the warnings and acknowledges understanding them. The questioning then concerned itself primarily with the whereabouts of the alleged victim. In *Brown,* this Court considered the time lapse, the distance to the second interrogation, the difference in the interrogators, and the difference in the statements obtained. On the basis of these differences, the Court found that the statements were involuntary.

In this case, the time lapse was substantially less; the ultimate statement was made within 5 ½ hours from the original taking of the appellant into custody and the knowing and voluntary waiver of his *Miranda* rights. The final questioning occurred at the police barracks and it may be rationally inferred, we think, absent proof to the contrary, that the barracks are located near the appellant's home.

While it is true that the ultimate information was given to Trooper Thomas rather than Trooper Hornung, it is clear from the record that the officers were cooperating in the investigation and we see no need for Trooper Thomas to have reiterated the *Miranda* warnings. Finally, the information obtained in the statements was essentially consistent throughout. To the end, the appellant denied doing any harm to his wife and also denied knowing her whereabouts. The vision he related having seen amounted, at the most, to a suggestion that his wife might be found in the water and it is significant, we think, that her body was not recovered

until two days after he had been charged. From our own independent review of the record, we find that the *Miranda* warnings were seasonably given, that the appellant understood and voluntarily waived these rights, and that there was no physical or psychological coercion used in obtaining the statements he made. We conclude that the trial judge did not err in denying appellant's motion to suppress the appellant's statements to the police.

### 2.

Appellant's second complaint is that the statements made by him to the police officers should have been suppressed because there was an unreasonable delay in presenting him to a judicial officer and, therefore, police had violated Maryland District Rule 723 a, which states in pertinent part as follows:

> a. *After Arrest.*
>
> A defendant who is detained pursuant to an arrest shall be taken before a judicial officer without unnecessary delay and in no event later than 24 hours after arrest.

Appellant claims that the delay was approximately 11 hours. It should be noted the 11 hour delay is well within the 24 hour limit prescribed by the Rule. The State argues that appellant's inculpatory statements were made not more than 7 ½ hours after appellant claims he was arrested. The State argues that when the appellant was taken into custody there was no intention to arrest him but the police were merely attempting to locate the alleged victim. The Court of Appeals, in *Johnson v. State,* 282 Md. 314, 329, 384 A.2d 709 (1978), enumerated one of the reasons which would excuse a failure to present an accused before a Commissioner even beyond the 24 hour period designated in MDR 723 as an effort "to obtain information likely to be a significant aid in averting harm to persons or loss to property of substantial value." The trial court, in hearing the appellant's complaint on this issue, found as a fact that "the series of events that

followed pointed not so much in finding out whether Mr. Collins was guilty of murder or assault with intent to murder, probably as much or more as they were interested in finding this woman who was obviously severely injured and perhaps dying." The trial judge's conclusion was clearly correct in the light of the fact that the evidence was that when the police approached appellant in his house they had arranged an ambulance waiting down the road to carry the alleged victim to the hospital. There was evidence before the trial court that during the lapse of time complained of by appellant, a number of firemen and a helicopter were engaged in searching for the victim in a fruitless attempt to save her life. We agree with the trial judge that these facts justified the delay in presenting the appellant to a Commissioner and that the court was correct in denying the motion to suppress on this ground.

## 3.

Appellant contends that the trial court erred in denying appellant's motion to dismiss for violation of the appellant's statutory and constitutional right to a speedy trial. We do not agree. The pertinent time frame of the proceedings in this case was as follows:

| July 16, 1980 | Appellant arrested. |
| January 16-21, 1981 | First trial — terminating in mistrial. |
| April 21, 1981 | State's witness undergoes hypnosis. |
| April 27, 1981 | Motion to dismiss for lack of speedy trial. |
| June 10-11, 1981 | Hearing on admissibility of hypnotically induced testimony. |
| July 1, 1981 | Trial rescheduled August 10, 1981. |

| . August 6, 1981 | Opinion and order of court on admissibility of hypnotically induced testimony. |
| August 10, 1981 | Motion to dismiss for lack of speedy trial. |
| August 10, 1981 | Trial |

In the course of the hearings on the motions to dismiss for lack of a speedy trial it was disclosed that appellant had been incarcerated since the date of his arrest and that the State had opposed and the court had denied bail. At the hearing on April 27, 1981, the State requested that the court rule on the admissibility of the hypnotically induced testimony in advance of trial. The record discloses that at the April hearing appellant moved to dismiss the indictment because he had not been tried within 180 days as required by Maryland Rule 746. Appellant did not move to dismiss upon any alleged violation of his constitutional right to a speedy trial. The trial court correctly denied appellant's motion since we have held that the 180 day rule (*Hicks* rule) does not apply to retrials. *See Donalds v. State,* 49 Md. App. 106, 430 A.2d 113 (1981).

After the trial judge denied the motion to dismiss on this ground, a discussion ensued between the State and counsel for the appellant as to the advisability of the trial court ruling pretrial on the issue of the admissibility of the hypnotically induced testimony. The prosecutor indicated that he was prepared to go forward on that issue but the trial judge expressed a reluctance to proceed in the light of the recently decided case of *Polk v. State,* 48 Md. App. 382, 427 A.2d 1041 (1981). The judge suggested that he would post-pone the case if requested by appellant's counsel and urged counsel to consider making the request in order that he might make a proper defense for his client. After full dis-cussion, appellant's counsel requested the postponement. The total elapsed time from the date of the original mistrial of January 21, 1981, to the date of trial August 10, 1981 was less than seven months. In the light of the factual situation in this case and the numerous complex pretrial issues

required to be heard and considered, we do not find appellant's right to a speedy trial having been violated under *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

### 4.

Appellant next contends that the trial court erred in allowing the State to admit into evidence the hypnotically induced testimony of one Alfred Lee Davis, one of the State's witnesses. Davis' memory had been hypnotically refreshed by Dr. Edmund T. Delaney, an expert in hypnotherapy, during the interim between the first and second trial of appellant. The hypnosis session was conducted after this Court filed its opinion in the case of *Polk v. State, supra.*

Appellant, in a pretrial motion to suppress, contended that hypnotically induced or refreshed memory is not regarded as reliable within the relevant scientific community and that the trial court should have held Davis to be incompetent to testify.[1]

The admissibility of hypnotically induced testimony and the use of this technique in memory assistance or retrieval has had a somewhat tortured history.

In *Harding v. State,* 5 Md. App. 230, 246 A.2d 302 (1968), *cert. denied,* 395 U.S. 949, 89 S.Ct. 2030, 23 L.Ed.2d 468 (1969), we held that:

> [O]n the facts of this case the testimony of Mildred Coley [the victim] was sufficient to support a jury's verdict that Harding [the accused] was guilty of the crime of attempted rape. In so holding we go no further than is required by those facts. The following evidence was adduced:

---

1. The trial judge, Edward O. Thomas, and counsel for the State and the appellant, are to be complimented for the thorough presentation of the scientific testimony offered in support of and in opposition to appellant's motion to suppress. We particularly commend Judge Thomas for his exhaustive analysis of the cases from outside jurisdictions which he discussed in his memorandum opinion and his discussion of the law review and scientific journal articles offered as exhibits in this case.

(1) the hypnosis procedure was fully exposed in the evidence; (2) the man who induced the hypnosis was a professional psychologist and gave his opinion that there was no reason to doubt the truth of the witness' statement; (3) there was sufficient corroboration of the witness' testimony: (a) male sperm was found in the victim's vagina, (b) the accused was one of two males shown to have known where the victim could have been found when the crime was committed, (c) the accused was seen in a station wagon immediately prior to the time the crime was committed. In addition, a precautionary instruction was given. [5 Md. App. at 246-47].

In *State v. Temoney,* 45 Md. App. 569, 576, 414 A.2d 240 (1980), *vacated on other grounds,* 290 Md. 251, 429 A.2d 1018 (1981), we relied on *Harding, supra,* and again held that hypnotically induced testimony was admissible. In *Harding,* we did not reach the issue of different scientific viewpoints or of general scientific acceptance of the use of hypnosis.

During the post *Harding* interim to the present, a substantial controversy arose in the scientific community as to the scientific justification for the admissibility of hypnotically induced testimony.[2] A number of jurisdictions followed *Harding*; however, in each of these cases the courts held that the post hypnotic recall was admissible with all questions going to the weight of the testimony. *See, e.g., Clark v. State,* 379 So.2d 372 (Fla. Ct. App. 1979); *State v. McQueen,* 295

---

2. *See generally,* Diamond, "Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness," 68 Cal. L.R. 313 (1980); Dilloff, "The Admissibility of Hypnotically Influenced Testimony," 4 Ohio N.U.L. Rev. 1 (1977); Levitt, "The Use of Hypnosis to 'Freshen' the Memory of Witnesses or Victims," Trial, April 1981; Spector and Foster, "Admissibility of Hypnotic Statements: Is the Law of Evidence Susceptible?" 38 Ohio St. L.J. 567 (1977); Annot.: Admissibility of Hypnotic Evidence at Criminal Trial, 92 A.L.R.3d 442 (1979); "Evidence-Admissibility of Present Recollection Restored by Hypnosis," 15 Wake Forest L. Rev. 357 (1979); Note, "Probative Value of Testimony from the Hypnotically Refreshed Recollection," 14 Akron L.R. 609 (1981); Note, "Safeguards Against Suggestiveness: A Means for Admissibility of Hypno-Induced Testimony," 38 Wash. & Lee L.R. 197 (1981).

N.C. 96, 244 S.E.2d 414 (1978); *State v. Jorgensen,* 8 Ore. App. 1, 492 P.2d 312 (1971).

In none of the cases above cited was the issue of general scientific acceptance of the hypnosis procedure addressed. As we held in *Polk v. State, supra,* the test for admission of evidence obtained from the use of a scientific principle, theory or discovery is derived from an early case which involved the question of the admissibility of evidence derived from polygraph tests. See *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923). Although the *Frye* test had been applied to a variety of situations in a number of jurisdictions, it was not adopted in Maryland until the decision in *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978), where Judge Eldridge, speaking for the Court of Appeals, acknowledged that "[T]he test which has gained general acceptance throughout the United States for establishing the reliability of such scientific methods was first articulated in *Frye v. United States,* [supra]." 283 Md. at 381. Judge Eldridge then quoted from the *Frye* opinion as follows:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a *well-recognized* scientific principle or discovery, the thing from which the deduction is made must be *sufficiently established to have gained general acceptance in the particular field in which it belongs.* (Emphasis supplied.) [*Id.* at 381].

Judge Eldridge further explained as follows:

> That is to say, before a scientific opinion will be received as evidence at trial, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field. Thus, according to the *Frye* standard, if a new scientific technique's validity is in controversy in the relevant scientific community, or if it is

generally regarded as an experimental technique, then expert testimony based upon its validity cannot be admitted into evidence. *[Id.* at 381].

*Reed* involved the admissibility of testimony concerning the use of voice prints. The Court of Appeals opined that there were compelling reasons to justify adherence to the *Frye* principle, when it stated:

Fairness to a litigant would seem to require that before the results of a *scientific* process can be used against him, he is entitled to a *scientific* judgment on the reliability of that process [Footnote omitted]. As stated by Judge McGowan, speaking for the court in *United States v. Addison,* 498 F.2d 741, 743-744 (D.C. Cir. 1974):

"[T]he *Frye* standard retards somewhat the admission of proof based on new methods of scientific investigation by requiring that they attain sufficient currency and status to gain the general acceptance of the relevant scientific community. This is not to say, however, that the *Frye* standard exacts an unwarranted cost. The requirement of general acceptance in the scientific community assures that those most qualified to assess the general validity of a scientific method will have the determinative voice."

The most recent decisions by other jurisdictions have consistently applied the general acceptance rule of *Frye. See Commonwealth v. Nazarovitch,* 496 Pa. 97, 436 A.2d 170 (1981); *State v. Conley,* 6 Kan. App.2d 280, 627 P.2d 1174 (1981); *State v. LeMountain,* 125 Ariz. 547, 611 P.2d 551 (1980); *People v. Tait,* 99 Mich. App. 19, 297 N.W.2d 853 (1980); *State v. Mack,* 292 N.W.2d 764 (Minn. 1980); *Greenfield v. Commonwealth,* 214 Va. 710, 204 S.E.2d 414 (1974). *Contra, State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1980). *See also Commonwealth v. Juvenile,* 381 Mass. 727,

412 N.E.2d 339 (1980); *People v. Lucas,* 107 Misc.2d 231, 435 N.Y.S.2d 461 (1980).

The Supreme Court of Minnesota declared in *Mack, supra:*

> Under the *Frye* rule, the results of mechanical or scientific testing are not admissible unless the testing has developed or improved to the point where experts in the field widely share the view that the results are scientifically reliable as accurate. Although hypnotically-adduced "memory" is not strictly analogous to the results of mechanical testing, we are persuaded that the *Frye* rule is equally applicable in this context, where the best expert testimony indicates that no expert can determine whether memory retrieved by hypnosis, or any part of that memory, is truth, falsehood, or confabulation — a filling of gaps with fantasy. Such results are not scientifically reliable as accurate.

> \* \* \* \* \* \*

> The crux of the problem is that hypnosis can create a memory of perceptions which neither were nor could have been made, and, therefore, can bring forth a "memory" from someone who cannot establish that she perceived the events she asserts to remember. [Footnote omitted]. Neither the person hypnotized nor the expert observer can distinguish between confabulation and accurate recall in any particular instance. [292 N.W.2d at 768-769].

Appellant contends that hypnosis is not analogous to other methods of refreshing a witness' recollection. A hypnotic subject, he charges, has a reduced perception of reality, an alteration in consciousness and a heightened sense of concentration and suggestibility. *See* Spector and Foster, *supra,* at 580. The subject is not only more easily influenced but is also more highly motivated to please others, most especially the hypnotist and those who are seen as associated

with him. Levitt, *supra,* at 56. In *Commonwealth v. Nazarovitch, supra,* the problem of hypnotic suggestibility was pinpointed where it is stated:

> The fact that the subject is eager to please the hypnotist does not imply that the subject would knowingly fabricate facts. However, in most cases involving forensic hypnosis, the subject is aware that the reason for the hypnotic session is an inability on his part to remember facts. A subject's awareness of the purpose of the hypnotic session, coupled with the hypersuggestibility which the subject experiences, amounts to a situation fraught with unreliability. Even when the hypnotist consciously attempts to avoid emitting signals, the problem may not be avoided. The hypnotic individual need not receive direct suggestions in order to try to please the hypnotist. [436 A.2d at 174].

The "memory" produced under hypnosis becomes hardened in the subject's mind. A witness who was unclear about his "story" before the hypnotic session may become convinced of the absolute truth of the account he recited under hypnosis. *See State v. Mack, supra.* This conviction reduces the possibility of meaningful cross-examination of the witness.

Appellee agrees that the threshold question in this case is whether a witness whose memory has been hypnotically refreshed is competent to testify, but contends that the testimony is admissible in a criminal trial if certain safeguards are employed. The State suggests that the purpose of hypnosis is to relax a person so that he can overcome the anxiety which is blocking memory recall. *See State v. Hurd, supra.* Assuming the safeguards recited in *Hurd, supra,* are met, counsel for the State argues that a memory refreshed by hypnosis is as reliable and is as subject to

cross-examination as a memory refreshed by any other method.[3]

Dr. Daniel Stern, one of the State's experts on hypnotherapy, described hypnosis as a "heightened state of awareness coupled with a heightened state of relaxation and nothing more." Dr. Stern testified that (assuming no sug-

---

**3.** The procedural safeguards as enunciated in *Hurd* are as follows:

First, a psychiatrist or psychologist experienced in the use of hypnosis must conduct the session. This professional should also be able to qualify as an expert in order to aid the court in evaluating the procedures followed. Although we recognize that there are many other people trained to administer hypnosis and skilled in its use for investigative purposes, we believe that a professional must administer hypnosis if the testimony revealed is to be used in a criminal trial. In this way, the court will be able to obtain vital information concerning the pathological reason for memory loss and the hypnotizability of the witness. Furthermore, the expert will be able to conduct the interrogation in a manner most likely to yield accurate recall.

Second, the professional conducting the hypnotic session should be independent of and not regularly employed by the prosecutor, investigator or defense. [Footnote omitted]. This condition will safeguard against any bias on the part of the hypnotist that might translate into leading questions, unintentional cues, or other suggestive conduct.

Third, any information given to the hypnotist by law enforcement personnel or the defense prior to the hypnotic session must be recorded, either in writing or another suitable form. This requirement will help the court determine the extent of information the hypnotist could have communicated to the witness either directly or through suggestion.

Fourth, *before* inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them. The hypnotist should carefully avoid influencing the description by asking structured questions or adding new details.

Fifth, all contacts between the hypnotist and the subject must be recorded. This will establish a record of the preinduction interview, the hypnotic session, and the post-hypnotic period, enabling a court to determine what information or suggestions the witness may have received during the session and what recall was first elicited through hypnosis. The use of videotape, the only effective record of visual cues, is strongly encouraged but not mandatory.

Sixth, only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and the post-hypnotic interview. Although it may be easier for a person familiar with the investigation to conduct some of the questioning, the risk of undetectable, inadvertent suggestion is too great, as this case illustrates. Likewise, the mere presence of such a person may influence the response of the subject. [86 N.J. 545-546].

gestions were made) "there is no difference in the reliability or validity of memory that is recalled through hypnosis or any other kind of memory recall."

The State relies heavily on *State v. Hurd, supra,* where it is held that hypnosis is not a test to determine truth but rather a tool to help a witness recall events in a criminal trial. *Id.,* 432 A.2d at 92. *Hurd* set forth a detailed and intricate set of procedural guidelines in order to guarantee the fundamental fairness of the use of the hypnotic process. *(See* note 3, *supra.)* The State contends that these guidelines were scrupulously observed in the case at bar and that in the light of *State v. Hurd, supra,* and of *Polk v. State, supra,* the trial judge did not err in denying the appellant's motion to suppress. A close examination of *Polk,* however, reveals that we reversed and remanded that case on the basis that the *Frye* test was applicable and that there must be a threshold determination as to whether hypnosis was generally acceptable in the relevant scientific community for the purpose of memory retrieval before the question of admissibility was ruled upon.

One of the most recent cases involving the admissibility of testimony retrieved by hypnosis is *People v. Shirley,* 181 Cal. Rptr. 243, 641 P.2d 775 (1982). The California Supreme Court, in an excellent exhaustive opinion written for the Court by Justice Mosk, concluded that the use of hypnosis to restore the memory of a potential witness was not generally accepted as reliable by the relevant scientific community. 641 P.2d at 804. The Court held that since the *Frye* test of admissibility had not been satisfied, the testimony of the witness who had undergone hypnosis for the purpose of restoring his memory of the events in issue was not admissible as to all matters relating to those events from the time of the hypnotic session forward. 641 P.2d at 804.

The Supreme Court of Minnesota, in *State v. Mack, supra,* held that it made no difference whether the testimony offered was produced by the State or defense, where it stated:

> We follow the best scientific authority, however, in rejecting as artificial and unprincipled any dis-

tinction between hypnotically-induced testimony offered by the defense to exculpate and that offered by the prosecution to make its case. Regardless of whether such evidence is offered by the defense or by the prosecution, a witness whose memory has been "revived" under hypnosis ordinarily must not be permitted to testify in a criminal proceeding to matters which he or she "remembered" under hypnosis. [292 N.W.2d at 771].[4]

The *Mack* Court went on to add that it found no reason why hypnosis could not continue to be used as an investigative tool, *i.e.,* to help a subject remember verifiable facts that could serve as "leads" for further investigation of the crime — such as license plate numbers — "as long as the material remembered during hypnosis is not subsequently used in court as part of an eyewitness's testimony." *Id.* at 768. The Court warned, however, that even when a witness is hypnotized for investigative purposes alone, the session must be conducted under safeguards adequate "to assure the

---

4. In State v. Hurd, *supra,* eminent experts from all parts of the country testified at the hearing, including one Dr. Martin T. Orne, a psychiatrist and acknowledged authority on the use of hypnotherapeutical procedures. The expert testimony is thoroughly summarized in the trial court's opinion, found at 173 N.J.Super. 333, 340-356 (Law Div. 1980). The hypnotic procedure in State v. Hurd was conducted by Dr. Herbert Spiegel, also a psychiatrist and expert in hypnotherapy. Dr. Spiegel admitted that persons under hypnosis could innocently espouse a suggestion as an absolute truth.

Dr. Orne's testimony led the court to the following conclusions: Among the conclusions to be drawn from Dr. Orne's testimony is that hypnosis, when properly conducted, may improve a subject's ability to recall past events to some degree. However, regardless of the care exercised in conducting a hypnotic session, there is an inherent possibility in all hypnosis that the subject's statements could constitute intentional lies, confabulations or fantasies. It is also Dr. Orne's position that hypnotically-induced recollections cannot be accepted unless they can be verified by independent corroboration. [173 N.J.Super. at 345-346].

Dr. Orne, despite other theoretical differences, agreed that: Concerning the forensic use of hypnosis . . . the importance of independent verification of hypnotically-induced recollection, and the most we should legitimately expect from hypnotic interrogations is further data which may serve as leads for more conventional evidence gathering. [Id. at 348].

utmost freedom from suggestion" in the event the witness is later called to testify to "recollections recorded before the hypnotic interview." *Ibid.*

In *People v. Shirley, supra,* the California Supreme Court followed the reasoning of Minnesota in *Mack* and declined to foreclose the use of hypnosis by the police for purely investigative purposes. 641 P.2d at 805.

*Collins v. Superior Court of State of Arizona,* decided *en banc* on May 4, 1982, 31 Cr.L. 2156, is the most recently decided case involving testimony elicited under hypnosis. In *Collins,* the Arizona Supreme Court modified its earlier decision that a witness who was hypnotized was incompetent to testify as to any fact. *See also State v. Mena,* 128 Ariz. 226, 624 P.2d 1274 (1981).

The *Collins* Court determined that hypnosis is now generally accepted *as a reliable investigative tool* by the scientific community. The Court, recognizing the inherent risks in the use of hypnosis even for investigatory purpose, decided that the risks could be minimized by safeguards such as cross-examination of the previously hypnotized witness and a record, preferably videotaped, of the witness's prehypnotic recollection. The Court, in explicating its reasons for its new position, stated:

> When used for prompting recall in order to provide valuable leads for investigation, hypnosis has less serious risks than the problem the technique presents when courtroom testimony is involved. Unlike a jury, an investigator need not make subjective evaluations of the truth or falsity of the hypnotic recall. He need only obtain leads for the purpose of subsequent investigation and verification.

> [A]pplying the *Frye* test of general acceptance and weighing the benefit against the risk, we modify our previous decision and hold that a witness will not be rendered incompetent merely because he or she was hypnotized during the investigatory phase of the case. That witness will be permitted to

testify with regard to those matters which he or she was able to recall and relate prior to hypnosis. Thus, for example, the rape victim would be free to testify to the occurrence of the crime, the lack of consent, the injury inflicted and the like, assuming that such matters were remembered and related to the authorities prior to use of hypnosis. [31 Cr.L. at 2156-2157].

After a complete and careful review of the record in this case, as well as the decisions of other jurisdictions and the scientific literature which has been called to our attention, we are convinced that applying the standards explicated in *Frye* for the use of hypnosis to restore or refresh the memory of a witness is not accepted as reliable by the relevant scientific community and that such testimony is therefore inadmissible. To the extent that previous cases in this jurisdiction have permitted the admissibility of hypnotically induced testimony, we hereby overrule those cases.

We note, however, as is evidenced by dicta in several of the cases which have so held that the practitioners of forensic science are continuing the ongoing controversy as to the appropriate utilization of this technique. The Court of Appeals stated in *Reed v. State, supra,* at 388:

As long as the scientific community remains significantly divided, results of controversial techniques will not be admitted, and all defendants will face the same burdens. If, on the other hand, a novel scientific process does achieve general acceptance in the scientific community, there will likely be as little dispute over its reliability as there is now concerning other areas of forensic science which have been deemed admissible under the *Frye* standard, such as blood tests, ballistics tests, etc.

It may well be that as hypnotherapeutical techniques are refined, such techniques may become acceptable in the relevant scientific community as several other techniques have achieved such recognition. Until this occurs, however,

hypnosis may be used only for investigatory purposes and under the strict guidelines as set forth in *State v. Hurd, supra.* (*See* note 3.)

### 5.

Appellant, in his fifth assignment of error, complains that the arresting trooper testified before the jury on two occasions that he had received a report that the appellant had shot his wife. We agree that the trooper's statements should not have been admitted. As we shall reverse on other grounds, the issue is moot and we consider it only for the purpose of guidance at retrial of the case.

### 6.

Finally, appellant contends that the trial court erred in failing to provide an opportunity for the accused to be present at a critical stage of the trial. As this issue is moot in the light of the retrial contemplated by our mandate in this case, we shall not discuss the issue in depth. Suffice it to say that our own independent consideration of the record convinces us that appellant knowingly waived his right to be present at the particular stage of the trial complained of. *See Haley v. State,* 40 Md. App. 349, 392 A.2d 551 (1978).

> *Judgments vacated; case remanded for a new trial.*
> *Costs to be paid by Worcester County.*