426 So.2d 76 (1983)
Linda Charlene BROWN, Appellant,
v.
STATE of Florida, Appellee.
No. AE-96.
District Court of Appeal of Florida, First District.
February 8, 1983.
*78 Michael E. Allen, Public Defender and P. Douglas Brinkmeyer, Asst. Public Defender, for appellant.
Jim Smith, Atty. Gen., and David P. Gauldin, Asst. Atty. Gen., for appellee.
ERVIN, Judge.
Appellant Brown appeals her convictions for the offenses of forgery, uttering a forged instrument and grand theft. Finding that there is substantial and competent evidence supporting the verdict for the offense of forgery, we affirm it. We reverse, however, the convictions of uttering a forged instrument and commission of grand theft, and remand those offenses to the lower court for further consistent proceedings. In so doing, we reaffirm the continuing vitality of, but reflect upon, principles implicit in our previous opinion in Clark v. State, 379 So.2d 372 (Fla. 1st DCA 1979), in which we found hypnotically-induced-recall-testimony to be admissible for consideration by a criminal trial jury.
The convictions in this case stem from a 1979 incident in Jacksonville when the appellant obtained certain company checks in the name of the Abreu Twin Mini-Shops. The Twin Mini-Shops had previously gone out of business, and the owner had closed its bank account, discarding the company checks. At trial, a bank teller at the Atlantic Bank testified that appellant had appeared at the bank with a Twin Mini-Shop check in the amount of $425.01 made out to Kathleen Coleman, a long-time bank customer who testified that she had neither seen nor endorsed the checks. The check, identified by the bank teller as bearing her teller stamp, was negotiated on November 6, 1979. A handwriting expert, after examining the handwriting on the check and the deposit slip, and comparing it with known exemplars of accomplice Ernest Brown and Linda Brown's handwriting, opined that Ernest Brown had written the material on the face of the check and that Linda Brown had done so on the reverse side as well as on the deposit slip. The evidence further revealed that the appellant had previously endorsed the check, using the Coleman name. The teller testified that appellant passed both the check and a deposit slip to her. Appellant's plan to deposit the $425.01 check and receive $300 back in cash was successful. Two days following the check's utterance, a deposit receipt in the name of Kathleen Coleman and in the amount of $125.01 was found in the pocket of a jacket belonging to co-defendant Ernest Brown.
During the two-year period between the check cashing incident and the trial, the teller's recollection of appellant's identity had faded from memory. It was apparent to the prosecution that without the testimony of the teller identifying appellant as the one who had cashed the check, the charges of uttering a forged instrument and grand theft would be difficult, if not impossible, to prove beyond a reasonable doubt. Police *79 Detective Bryant Mickler was called in to hypnotize the teller in an effort to assist her in refreshing her faded memory as to the day of the crime. It does not appear from the record that Mickler had any connection with the investigation of this case, other than to hypnotize the teller. Experienced in hypnosis, he claimed to have hypnotized over 2,000 people, been trained through many courses, and taught a course in hypnosis at a local junior college, but was admittedly not a medical expert. Mickler's testimony as to hypnosis had been utilized 12 times in court.
Our record review discloses that he knew nothing about the witness before hypnotizing her, that he was alone with her at the time of hypnosis, and that he placed her into "progressive relaxation," taking her back to the day of the crime and asking or perhaps telling her to try to recall the specifics of the incident and the identity of the person from whom she received the forged check. After she was brought out of the hypnotic trance, another detective displayed some photographs to her, and the witness selected a picture of the appellant.
The hypnosis session transpired on Friday morning, May 1, 1981, four days before trial. It was only shortly after the session took place that appellant's counsel was first advised of its occurrence. Upon learning that the teller had made a positive identification of his client, the attorney spent the weekend researching the legal ramifications of using hypnosis in a criminal trial. On Monday, the day before trial, he deposed Mickler. On the following day, just before trial, appellant's counsel sought a continuance, claiming prejudice based on the short notice of the hypnosis session, alleging that he was unable to depose the hypnotist until the day before trial and that he wished to obtain another expert for the purpose of presenting evidence concerning hypnosis in appellant's favor. The motion was denied, and appellant was subsequently convicted of forgery, uttering a forged instrument, and grand theft.
In answer to appellant's arguments assailing the convictions imposed, we respond that a judgment will not be reversed, unless the error of the evidence's admission was prejudicial to the substantial rights of the appellant. Prejudice will not be presumed. Section 924.33, Fla. Stat. (1979); Palmes v. State, 397 So.2d 648, 653 (Fla. 1981), cert. denied, 454 U.S. 882, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981). This requires us to determine whether, but for the admission of the testimony of the teller and the hypnotist, the result below in regard to each of the three offenses might have been different. Palmes, at 654. It seems apparent to us that the admission of Officer Mickler's hypnosis testimony related solely to the charges of uttering a forged instrument and grand theft. Mickler testified as to the procedures used in hypnotizing the teller, while the teller testified concerning the method by which she processed the Twin Mini-Shop check, and her identification of appellant as the individual who passed her a pre-endorsed Abreu Twin Mini-Shops check was the product of her hypnotized state. She did not testify, however, that she had witnessed the actual act of forgery.
Her testimony did not relate to proving any of the elements of forgery, which include the requirements: (1) that there be a falsely made or materially altered written instrument; (2) that the writing be of such a character that, if genuine, it might apparently be of legal efficacy for injury to another, or the foundation of a legal liability; and (3) that there be an intent to injure or defraud. See Ch. 831, Fla. Stat.; 16 Fla.Jur.2d Criminal Law §§ 1564-1568 (1979).
Although the evidence against Linda Brown was circumstantial as it related to the forgery charge, it was nonetheless sufficient. Independent of the questionable identification of appellant as the person who uttered the forged check, Brown and her accomplice were both shown to be, through the testimony of the expert examining the questioned documents, in possession of a check stolen from the Abreu Twin Mini-Shops. Both the purported maker and purported endorser of the check denied either that they had written anything on the *80 check or had authorized anyone to do so. Neither of the two Browns offered any explanation as to how they came into possession of the check.
We held in a case which reversed a conviction for uttering a forged instrument that because the only evidence against the defendant was that he had possession of a forged check and caused it to be cashed, yet offered a reasonable explanation for its possession, the evidence was insufficient to convict. Heath v. State, 382 So.2d 391 (Fla. 1st DCA 1980). We observed, due to the explanation offered, and the absence of any other evidence of guilty knowledge, such as a handwriting analysis, that possession of the stolen check did not give rise to an inference that the appellant knowingly uttered the forged instrument. Conversely, we consider that such inference could apply to facts such as those in the case before us and is one which the jury could properly weigh in its determination of guilt. The Florida Supreme Court, in sustaining the constitutionality of Section 812.022(2), Florida Statutes (1977),[1] reasoned that "[s]ince there [was] a rational connection between the fact proven (the defendant possessed stolen goods) and the fact presumed (the defendant knew the goods were stolen), the inference created by section 812.022(2) does not violate [the defendant's] due process rights." Edwards v. State, 381 So.2d 696, 697 (Fla. 1980).
There is a similar rational connection here. In addition to evidence revealing both defendants' possession of the stolen check, without reasonable explanation therefor, the record discloses possession by appellant's accomplice of a deposit receipt containing the difference between that deposited and that received from the forged check. Moreover, the deposit slip was shown through the testimony of the handwriting expert to have been at some point in time in possession of the appellant. As stated, all of this evidence was obtained independently of the questionable method used to retrieve the bank teller's memory relating to the identification of appellant as the person who passed the check. Cf. Davis v. State, 364 So.2d 19 (Fla. 1st DCA 1978), cert. denied, 373 So.2d 457 (Fla. 1979).
We are unable to say, after considering the record as a whole, that any of the allegedly prejudicial evidence, if excluded, might have affected the jury's verdict as to the forgery charge. Consequently, we affirm the conviction of forgery.
Appellant also challenges the lower court's denial of her motion for a continuance. She argues that the untimely scheduled hypnosis session did not give her an adequate opportunity to obtain expert witnesses in opposition to the hypnosis process utilized by the state and the hypnotist who testified for the state. "A motion for a continuance is directed to the sound discretion of the trial judge." Jordan v. State, 419 So.2d 363 (Fla. 1st DCA 1982). If the lower court denies the motion for a continuance, the court's ruling will not be disturbed, unless a palpable abuse of discretion is demonstrated to the reviewing court. Jent v. State, 408 So.2d 1024, 1028 (Fla. 1981), cert. denied, ___ U.S. ___, 102 S.Ct. 2916, 73 L.Ed.2d 1322 (1982).
A number of cases detail circumstances rising to the level of a palpable abuse of discretion. Harley v. State, 407 So.2d 382 (Fla. 1st DCA 1981); Lightsey v. State, 364 So.2d 72 (Fla. 2d DCA 1978); and Sumbry v. State, 310 So.2d 445 (Fla. 2d DCA 1975). The common thread running through each of these cases is that defense counsel must be afforded an adequate opportunity to investigate and prepare any applicable defenses. This right is inherent in the right to counsel. Harley, at 384, citing Brooks v. State, 176 So.2d 116 (Fla. 1st DCA 1965), cert. denied, 177 So.2d 479 (Fla. 1965). Further, it is founded on constitutional principles of due process and cast in the light of notions of a right to a fair trial. Harley, at 383-384; see also Sumbry, 310 So.2d at 447.
*81 In the case at bar, trial was held on Tuesday morning. Defense counsel did not learn of the hypnosis session until mid-day the Friday before trial. Counsel was not even furnished the opportunity to depose the police hypnotist until Monday, the day before trial. Surely, due process demands that counsel be afforded a fairer means by which to prepare his defense to this critical evidence. In discussing the use of information gained from scientific techniques that has been placed into evidence, Professor Paul C. Giannelli of Case Western Reserve University, notes:
Effective cross-examination and refutation presuppose adequate notice and discovery of the evidence the opposing party intends to introduce at trial... . Securing the services of experts to examine evidence, to advise counsel, and to rebut the prosecution's case is probably the single most critical factor in defending a case in which novel scientific evidence is introduced.
Giannelli, The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half-Century Later, 80 Colum.L.Rev. 1197, 1240, 1243 (1980) [hereinafter: Giannelli]. We consider that by the court's restricting defense counsel's ability to prepare an adequate defense, the aforementioned safeguard of liberal cross-examination was impinged. We therefore find it was a palpable abuse of discretion on the part of the lower court to deny the appellant's motion for a continuance, insofar as the motion related to the offenses of uttering a forged instrument and grand theft.
We reverse the above two convictions and remand for a new trial for the reasons stated. Since conviction on the charges of uttering a forged instrument[2] and grand theft[3] apparently depends upon hypnotically-induced-recall-testimony, we feel it necessary to explore the ramifications of accepting testimony into evidence from a witness whose memory has been refreshed by hypnosis. The use of this type of testimony has been the subject of continuing public attention by the news media,[4] as well as by various legal commentators,[5] and has been utilized in a number of well-known cases.[6]
Our analysis of the use of such testimony involves a discussion of three component parts: First, a recognition of five basic problem areas stemming from the use of hypnosis; second, whether Florida should bar from admission into evidence such testimony on the ground that the principle of hypnosis is unreliable in view of the "general *82 acceptance," or Frye rule, and third, if the Frye rule is either rejected or considered inapplicable to hypnotically-induced-recall-testimony in Florida, the utilization of certain safeguards to ensure that the probative value of such testimony is not substantially outweighed by certain prejudicial factors.

I.
Our research has revealed five basic problem areas stemming from the use of hypnosis.[7] These areas include:
(1) hypersuggestiveness;
(2) hypercompliance;
(3) confabulation;
(4) jury misunderstanding of the concept of hypnosis, and
(5) unusually strong confidence by the hypnotized subject in his ability to recall events accurately.
The first three of the foregoing problem areas arise from the hypnosis session itself and are inherent in the nature of hypnosis. The fourth and fifth areas deal with problems arising after the hypnotic session, stemming from in-court use of such testimony.

A.
The first of the three problem areas that inhere in the process of hypnosis is hypersuggestiveness, meaning a mental state in which a subject surrenders a great degree of will power and independent judgment to the hypnotist. Comment, Hypnosis  Its Role and Current Admissibility in the Criminal Law, 17 Willamette L.Rev. 665, 671-673 (1981) [hereinafter: Hypnosis and Criminal Law]. This condition stems in great part from the intense interpersonal relationship between the hypnotist and the subject, as well as from the very nature of hypnosis. 2 Spiegel, Comprehensive Textbook of Psychiatry § 30.4 (2nd ed. 1975). In essence, the subject has a heightened sense of awareness in which he is open to even the most minimal of cues from the hypnotist.
The problem of hypersuggestiveness manifests itself in four different ways: First, the "minimal cues" do not necessarily consist of verbal orders or suggestions from the hypnotist. Often, the tone of voice, demeanor of the hypnotist, or "body language" of the hypnotist may be the agent of suggestion. Diamond, Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness, 68 Calif.L.Rev. 313, 333 (1980) [hereinafter: Diamond]. The suggestion may be unintended or unperceived by the hypnotist. See People v. Shirley, 31 Cal.3d 18, 181 Cal. Rptr. 243, 641 P.2d 775, 802-803 n. 46 (1982), cert. denied, ___ U.S. ___, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982). Consequently, the hypnotist may ask the witness, "Were there two, three, or four robbers?" In so doing, he may inadvertently cue the witness by lowering his voice to emphasize the word "two." This minimal cue, although inadvertent, suggests to the hypnotized witness that he should remember there were indeed two robbers. Even leading questions may cause this result.[8] Dilloff, The Admissibility of Hypnotically Influenced Testimony, 4 Ohio N.U.L.Rev. 1, 4 (1977) [hereinafter: Dilloff].
*83 The second manifestation of hypersuggestiveness results in instances of the hypnotist who is predisposed to eliciting a particular response from a witness. Inadvertent, subconscious influences may be exerted upon the subject resulting in a particular response as noted above. Dilloff, supra at 4; see also Hypnosis and Criminal Law, supra, at 672. Perhaps too, in extreme circumstances, the predisposed, unscrupulous hypnotist might consciously attempt to manipulate the hypnotized subject through "brainwashing." Dilloff, supra, at 6. Although a person who has been hypnotized probably cannot be made to do something contrary to his moral standards, it is conceivable that the unscrupulous hypnotist could induce a subject to recall erroneously a false pivotal fact which in reality the witness never did observe. Hypnosis and Criminal Law, supra, at 672 n. 47. Obviously an avoidance of this particular manifestation would be promoted by requiring that anyone hypnotizing a witness in preparation for a criminal trial be completely independent and neutral.
A third manifestation inheres in the depth of hypnosis. "The more deeply hypnotized the subject, the more susceptible he may become to suggestions by the hypnotist." Dilloff, supra, at 5 (footnote omitted); Note, Safeguards Against Suggestiveness: A Means for Admissibility of Hypno-Induced Testimony, 38 Wash & Lee L.Rev. 197, 201 (1981) [hereinafter: Safeguards].
Finally, the fourth manner in which hypersuggestiveness manifests itself is due to the way in which hypersuggestiveness interrelates with the other two problem areas of hypnosis: hypercompliance and confabulation.
Hypercompliance results from the fact that a subject under hypnosis is often eager to succeed in being hypnotized and, more important, to please the hypnotist. Diamond, supra, at 337; People v. Shirley, 641 P.2d at 802-803; Commonwealth v. Nazarovitch, 496 Pa. 97, 436 A.2d 170, 174 (1981). Hence, "a subject often will incorporate into his response his notion of what is expected of him." State v. Hurd, 86 N.J. 525, 432 A.2d 86, 93 (1981). As noted previously, voice intonations and gestures by the hypnotist can provide unwitting cues concerning the examiner's expectations of the witness.[9]Id., 432 A.2d at 94; see also Hypnosis and Criminal Law, supra, at 684 n. 127. The drive or motivation to answer questions and "please" the hypnotist is perhaps much stronger in the criminal trial or investigation setting because of two factors: First, most people truly want to help solve crimes. Second, if the hypnotized witness is also the victim, the motivation to answer may be even more compelling. People v. Shirley, 641 P.2d at 801 n. 42; cf. State ex rel. Collins v. Superior Court, 132 Ariz. 180, 644 P.2d 1266, 1289 (1982).
The third problem with hypnosis is that of confabulation. Confabulation is the innate tendency of a hypnotized subject to manifest a decrease in critical judgment. Orne, The Use and Misuse of Hypnosis in Court, 27 International Journal of Clinical and Experimental Hypnosis 311, 319 (1979) [hereinafter: Orne]. This decrease in critical judgment seems to manifest itself in occasional memory distortions, sheer fantasy, and even willful lies in recalling specific events. Hurd, 432 A.2d at 92; State v. Mena, 128 Ariz. 226, 624 P.2d 1274, 1277 (1981); Dilloff, supra at 4. Although most people are unaware of this fact, the currently accepted view in the scientific community is that no one's conscious or subconscious memory recalls all details in minute detail. No one has a perfect memory. An individual's recall of a specific event may have gaps in it. The mind simply is not a videotape recorder. Orne, supra, at 321; Note, The Admissibility of Testimony Influenced by Hypnosis, 67 Va.L.Rev. 1203, 1209 (1981). The commentators and experts are *84 united in the view that hypnotized subjects can and occasionally do prevaricate while under hypnosis. See, e.g., Dilloff, supra, at 5; Hypnosis and Criminal Law, supra, at 670; Orne, supra, at 318-319. For reasons that are apparently unknown, a hypnotized subject may attempt to fill in memory gaps with false memories and inaccuracies by confabulation. Hypnosis and Criminal Law, supra, at 670 n. 32.
The first legal forecast of this problem came in a 1902 article pointing to the unreliability of hypnosis due to "illusions and hallucinations" that a subject incurs while in a trance. Ladd, Legal Aspects of Hypnotism, 11 Yale L.J. 173 (1902). Since that time a number of courts have accepted confabulation as one of the key areas of concern in demonstrating the reliability of recall testimony drawn from a witness' previous hypnosis session. See, e.g., People v. Shirley, 641 P.2d at 795, 802-803; Hurd, 432 A.2d at 92-94; State v. Mack, 292 N.W.2d 764, 771 (Minn. 1980); and Nazarovitch, 436 A.2d at 174.
The California Supreme Court was particularly concerned by the interplay between the problems of confabulation and hypercompliance.[10] Due to problems with hypercompliance, the witness will refuse to admit that his memory is imperfect and has gaps in it. He will want to try to fill those gaps. People v. Shirley, 641 P.2d at 803. This could produce a recall of an event comprised of "(1) relevant actual facts, (2) irrelevant actual facts taken from an unrelated prior experience of the subject, (3) fantasized materials (`confabulations') unconsciously invented to fill gaps in the story, and (4) conscious lies  all formulated in as realistic fashion as" is possible. Id. So too, Dr. Martin T. Orne, who is one of the foremost experts on the subject of hypnosis, has observed that the concept of hypersuggestibility is linked to the problem of confabulation. He points out that "[t]he same process which increases suggestibility by permitting the subject to accept counterfactual suggestions as real also makes it possible for the subject to accept approximations of memory as accurate." Orne, supra, at 319.[11] Thus
[t]he risk of confabulation is especially great during post-hypnotic suggestion when the hypnotist suggests that the subject will remember clearly the forgotten event when the subject has no actual memory of the event... . The subject may feel pressured to respond to the hypnotic suggestion as a result of desire to please the hypnotist. In addition, the subject tends to respond literally to hypnotic suggestion... . These factors enhance the potential for the hypnotized person to "remember" events that actually did not occur.
Safeguards, supra, at 200, n. 23.

B.
While there are three areas of concern inherent in the actual process of hypnosis, as above observed, there are also two post-hypnosis problem areas. One problem area inheres in the view held by some members of juries that hypnosis is infallible. The other problem relates to the high level of confidence with which a witness becomes endowed after hypnosis. This level of confidence affects the ability of counsel to succeed in demonstrating problems with a witness' testimony on cross-examination. It also affects the ability of jurors to detect changes in the witness' demeanor and a lack of accuracy of recall.
Turning to the first of the two post-hypnosis session problems, there is a generally accepted view that many people believe that hypnosis acts as a form of foolproof truth serum, preventing a witness who has *85 been hypnotized from lying. As one commentator has indicated: "[M]any laymen believe that the power of hypnosis, clothed in its veil of mystery, prevents willful deception." Dilloff, supra, at 5. As noted in the foregoing paragraphs on confabulation, this perception is in error. Id., Orne, supra, at 313, 321; Admissibility of Testimony Influenced by Hypnosis, supra, at 1208. Recognition of this problem makes it imperative that a party-opponent to the admission of hypnotically-induced-recall-testimony have ample opportunity to educate a jury as to the fact that hypnosis is not a guarantor of truth. It is merely a tool to assist a witness in refreshing a memory that is fallible. So too, the responsibility of enlightening the jury as to the nature of hypnosis is one for the trial court.
The other post-hypnotic session problem stems from the fact that a witness who is uncertain of his recollections before being hypnotized and who has confabulated during hypnosis will become convinced that the post-hypnotic recollections are absolutely accurate. This process is caused by the fact that both before and during hypnosis the witness is told that he will remember everything clearly.[12]
These concepts interrelate with each other and may be manifested strongly on the witness stand through a syndrome known as posthypnotic source amnesia. See People v. Shirley, 641 P.2d at 803-804. This syndrome
occurs when something learned under hypnosis is carried into the wakened state but the fact that the memory or thought was learned under hypnosis is forgotten... . A subject who has lost the memory of the source of his learned information will assume that the memory is spontaneous to his own experience. Such a belief can be unshakeable, last a lifetime, and be immune to all cross-examination. It is especially prone to "freeze" if it is compatible with the subject's prior prejudices, beliefs, or desires.
Diamond, supra, at 336 (footnote cites omitted); accord, Orne, supra, at 320, 332; People v. Gonzales, 108 Mich. App. 145, 310 N.W.2d 306, 310 n. 4, 312 (1981).
As Professor Bernard Diamond notes, most witnesses not previously subjected to hypnosis, when cross-examined as to their recall of events, communicate their uncertainties by hesitancy in answering, expressions of doubt, and body language revealing a lack of self-confidence. These crucial indicators of demeanor are equal to or greater than the bare substance of the testimony in forming the foundation on which a jury determines the weight of the evidence. "Because the [previously hypnotized] witness subjectively believes the veracity of the memory, cross-examination loses effectiveness as a means of attacking credibility and the accuracy of the recall." Safeguards, supra, at 203.[13]

II.
Confronting the foregoing problems, many out-of-state jurisdictions called upon to admit hypnotically-induced-recall-testimony into evidence have ruled against admission. However, almost without exception,[14] *86 the courts that have refused to admit such testimony have relied on the so-called "general acceptance," or "Frye rule", originally set forth in Frye v. United States, 293 F. 1013 (D.C. Cir.1923). In Frye, the court declined to admit the results of a lie detector test, known as the "systolic blood pressure deception test," into evidence, because the test had not been generally accepted by the scientific community.
Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a wellrecognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

Id. at 1014 (e.s.).
The test obviously applies to any evidence adduced from any new scientific technique or method,[15] and the overwhelming number of jurisdictions that have opposed admission of hypnotically-induced-recall-testimony have generally relied on Frye.[16] Therefore, the underlying issue in this case is whether the Frye rule is the applicable evidentiary concept in our jurisdiction by which a court may ascertain whether to admit results of a new or controversial scientific technique or test, and of testimony induced by hypnosis. If it is, can the technique used to induce such testimony be considered "scientific"? As was recently explained by the Arizona Supreme Court:
To a large extent, the decision on the use of hypnotically induced recall turns on the resolution of a single question of policy. The true issue is whether Frye should be applied to determine the basic reliability of the new technique as a prerequisite for use in the courtroom, thus leaving only foundational questions for the trial court, or whether the trial court should be left free to decide both basic reliability and foundational questions on a case-by-case basis. The cases proceed along two separate lines, based not so much on how the court views hypnosis (there being a general consensus that it presents a great deal of danger), but primarily on whether the court applies the Frye principle in making its determination.
State ex rel. Collins, 644 P.2d at 1282.
It is uncertain from our review of Florida cases whether Frye has been accepted in Florida. Certainly no state decision has explicitly applied it. In Kaminski v. State, 63 So.2d 339 (Fla. 1952), the supreme court cited Frye and other cases as authority for the view that the results of lie detector tests were inadmissible, because such tests *87 had not then gained sufficient acceptance in the scientific community. However, the court did not adopt Frye, since the case presented a more narrow question as to whether testimony concerning the taking of a lie detector test, rather than its results, should have been admitted. Id. at 340.
The only other Florida case we have found which specifically refers to the Frye rule is Coppolino v. State, 223 So.2d 68 (Fla. 2d DCA 1968), appeal dismissed, 234 So.2d 120 (Fla. 1969), cert. denied, 399 U.S. 927, 90 S.Ct. 2242, 26 L.Ed.2d 794 (1970). The facts there reveal that Coppolino murdered his wife by a lethal injection of succinylcholine chloride. An expert witness for the state was the person who testified as to the cause of death. This witness arrived at his conclusion by utilizing a new test that he had developed. Several other witnesses, including those presented by the state, testified that medical science believed it was impossible to demonstrate the presence of succinylcholine chloride in the body. Nevertheless, the trial court admitted the test results. The Second District Court of Appeal, in affirming, observed that the Frye rule was apparently the law based on the Supreme Court's earlier decision in Kaminski. The court, however, did not apply Frye. Instead it ruled that the trial court had properly admitted the test results, because there was substantial competent evidence to find the tests were reliable. Coppolino, 223 So.2d at 70-71.
Although the Coppolino court cited Frye as the proper rule to apply to determine admissibility, it is clear from the opinion that Frye was not applied. If it had been employed, the test results clearly would have been inadmissible. It also appears that the passing reference in Coppolino to Frye as being the correct approach to utilize is one with which we must respectfully disagree. We do not read Kaminski as having adopted Frye. Our view is supported by the Supreme Court's recent decision in Jent v. State, 408 So.2d at 1029, in which the court considered that a hair analysis which matched Jent's hair with evidence was admissible. The court stated:
As a general rule, the problem presented to a trial court is whether scientific tests are so unreliable and scientifically unacceptable that admission of those test results constitutes error. Coppolino v. State, 223 So.2d 68 (Fla. 2d DCA 1968), ... . A trial court has wide discretion concerning the admissibility of evidence, and, in the absence of an abuse of discretion, a ruling regarding admissibility will not be disturbed.
Id. (e.s.). The foregoing quoted rule clearly is not an adoption of the Frye holding, although there is a reference to scientific acceptability. Of greater significance is the fact that neither Frye nor Kaminski are alluded to in Jent, although the court did refer to Coppolino as authority for its position.
More recently the Florida Supreme Court cited Coppolino as supporting its view that "[a] court should admit evidence of scientific tests and experiments only if the reliability of the results are widely recognized and accepted among scientists." Stevens v. State, 419 So.2d 1058, 1063 (Fla. 1982). Superficially, it would seem that the above statement embraces the Frye rule, yet the court's reliance upon Coppolino undercuts that interpretation. Additionally, the statement made in the same paragraph that "[t]he admissibility of a test or experiment lies within the discretion of the trial judge ..." is contrary to Frye since a strict adherence to Frye would severely curtail trial court discretion. The latter quoted statement is, moreover, consistent with the court's earlier opinion in Jent.
The view expressed by certain scholars is that Coppolino not only does not accept Frye, but in fact utilizes the preferred approach[17] in dealing with the question of *88 admissibility. This method is known as the "relevancy approach." See Giannelli, supra, at 1232-1245; McCormick on Evidence, § 203 (2nd ed. 1972). Dean McCormick states:
The practice approved in the last mentioned case [Coppolino] is the one which should be followed in respect to expert testimony and scientific evidence generally. "General scientific acceptance" is a proper condition for taking judicial notice of scientific facts, but not a criterion for the admissibility of scientific evidence. Any relevant conclusions which are supported by a qualified expert witness should be received unless there are other reasons for exclusion. Particularly, probative value may be overborne by the familiar dangers of prejudicing or misleading the jury, and undue consumption of time. If the courts used this approach, instead of repeating a supposed requirement of "general acceptance" not elsewhere imposed, they would arrive at a practical way of utilizing the results of scientific advances.
McCormick, supra, § 203 at 491 (footnotes omitted).
The above view accords fully with the Florida Evidence Code. See Ch. 90, Fla. Stat. (1979). The material sections of the code are Sections 90.401, .402 and .403, which we are required to read in pari materia.[18] Section 90.402 provides that "[a]ll relevant evidence is admissible, except as provided by law." There are, of course, two forms of relevancy: logical and legal. Atlantic Coast Line R. Co. v. Campbell, 104 Fla. 274, 139 So. 886, 890 (1932). "The relevancy of a fact to the issue being tried is ordinarily a question of logic rather than one of law." 23 Fla.Jur.2d Evidence and Witnesses § 123 (1980). Consequently, whether a fact at issue is logically relevant is controlled by Section 90.401, stating that "[r]elevant evidence is evidence tending to prove or disprove a material fact." Because the bank teller's testimony in the case at bar was the crucial evidence identifying appellant as the individual who committed the offenses of grand theft and uttering a forged instrument, the testimony is obviously material and logically relevant.
This evidence may yet be inadmissible if it is not legally relevant. See McCormick, supra § 185 at 440-441; 23 Fla.Jur.2d Evidence, supra, at § 124; Cotton v. United States, 361 F.2d 673, 676 (8th Cir.1966); Hoag v. Wright, 34 App.Div. 260, 54 N.Y.S. 658, 662 (1898). Section 90.403 encompasses the test for legal relevance by requiring that "[r]elevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or needless presentation of cumulative evidence... ."[19] (e.s.) It is in the area of *89 legal relevancy that certain undertones of Frye become applicable. If Frye should not be per se applied to bar evidence obtained from a new or controversial technique solely because the method is not generally accepted by the scientific community, the technique's reliability is a factor to be considered by the trial judge in determining the question of the evidence's legal relevance. As noted by Professor Giannelli, supra, at 1235 (footnotes omitted): "The probative value of scientific evidence,..., is connected inextricably to its reliability; if the technique is not reliable, evidence derived from the technique is not relevant."
The reliability of the scientific method in question can be established in a number of ways. The party proponent could, for example, introduce evidence of the technique's proven track record and general acceptance by science, or present expert testimony of its reliability. The relevancy approach thus differs from Frye in not necessarily precluding the admissibility of evidence which is not generally considered reliable by the scientific community; yet it is similar to Frye in recognizing that "novelty and want of general acceptance are integral parts of the relevancy analysis which may lessen the probative value of a scientific test or technique." Giannelli, supra, at 1234 (e.s.); accord, McCormick, supra at 364.
In Florida, as a matter of law, certain scientific techniques have been found to be so completely devoid of reliability as to fail as probative evidence. Knight v. State, 97 So.2d 115 (Fla. 1957) (truth serum); see also Zeigler v. State, 402 So.2d 365 (Fla. 1981), cert. denied, 455 U.S. 1035, 102 S.Ct. 1739, 72 L.Ed.2d 153 (1982) (sodium butathol test).[20] Other techniques, however, have been held to have sufficient reliability so as to vest discretion in the trial court to consider Section 90.403's balancing test for legal relevancy. See, e.g., Jent (hair comparison analysis); Carlyon v. Weeks, 387 So.2d 465, 468 (Fla. 1st DCA 1980) (HLA blood paternity test). In Clark v. State, we held as a matter of law the principle of hypnosis was sufficiently reliable, and that the testimony of both the hypnotist and hypnotized witness was of sufficient probative value to be presented to the jury. The application of the "relevancy approach" is implicit in Clark and the other foregoing cases.
At any event, whether Frye is the rule to be applied to a new or controversial scientific technique is not one we are called upon to decide since we conclude that the method by which testimony is hypnotically induced is not one that falls within the ambit of Frye. "[T]echnically the test is not directly applicable because it is concerned with the admissibility of expert opinion deduced from the results of a scientific technique, such as a lie detector test, and not with the admissibility of eyewitness testimony." Note, The Admissibility of *90 Testimony Influenced by Hypnosis, 67 Va.L. Rev. 1203, 1217 (1981) (e.s.); accord, Commonwealth v. Juvenile, 381 Mass. 727, 412 N.E.2d 339, 342-343 (1980). Our view is supported by that of the New Jersey Supreme Court in State v. Hurd, which observed:
Unlike the courts in Mena, supra, and Mack, supra, the court below did not demand, as a precondition of admissibility, that hypnosis be generally accepted as a means of reviving truthful or historically accurate recall. We think this was correct. The purpose of using hypnosis is not to obtain truth, as a polygraph or "truth serum" is supposed to do. Instead, hypnosis is employed as a means of overcoming amnesia and restoring the memory of a witness. See Spector & Foster, Admissibility of Hypnotic Statements: Is the Law of Evidence Susceptible?, 38 Ohio St.L.J. 567, 584 (1977)... . In light of this purpose, hypnosis can be considered reasonably reliable if it is able to yield recollections as accurate as those of an ordinary witness, which likewise are often historically inaccurate.
432 A.2d at 92. See also State v. Beachum, 97 N.M. 682, 643 P.2d 246, 252 (Ct.App. 1981).
The appellant perceptively notes that the underpinnings of Clark were furnished by Harding v. State, 5 Md. App. 230, 246 A.2d 302 (1968), cert. denied, 252 Md. 731, cert. denied, 395 U.S. 949, 89 S.Ct. 2030, 23 L.Ed.2d 468 (1969), in which the Maryland Court of Appeals explained at length that hypnosis was reliable and admissible. Because the Maryland court has since receded from Harding and now bars admission of hypnotically-induced-recall-testimony by virtue of its opinion in Collins v. State, 52 Md. App. 186, 447 A.2d 1272 (1982), appellant argues that the foundation of our opinion in Clark has now been eroded. We disagree. The Collins court relied on the Frye rule as the correct basis for barring the admission of hypnotically-induced-recall-testimony and, as we have explained, Frye is inapplicable to the technique used to influence the recall of such testimony. We therefore conclude that the "relevancy approach" is the test to be applied to this type of memory retrieval; consequently Clark was correctly decided.

III.
Although the principle of hypnosis may itself be reliable and thus probative, our examination of the problems inherent in the process of hypnosis reveals that admissibility of such testimony will hinge on a case-by-case examination of the technique used to hypnotize the witness. The examination of the particular procedure employed in order to determine its reliability interrelates with the second prong of the relevancy test: legal relevancy. Due to the peculiar nature of hypnosis and its inherent potential pitfalls, the admissibility of hypnosis, as a tool for refreshing a witness' memory, is not so much a question of the reliability of the principle of hypnosis as it is a question of the reliability of the particular technique or procedure used in a given case. Hence, the probative value of hypnosis rests on both the reliability of the principle and the technique or procedure employed, both of which are inseparably intertwined. The court must first evaluate such evidence pursuant to Section 90.403, Florida Statutes, by weighing its probative value in an effort to decide if its admissibility would be substantially outweighed by dangers of unfair prejudice, confusion of the issues, misguidance of the jury, or needless presentation of the issues.[21]
Thus, either upon objection to introduction into evidence of hypnotically-induced-recall-testimony, *91 or upon its proffer, it is the burden of the party seeking to present such evidence to demonstrate that the hypnosis session and use of that evidence will not cause undue prejudice or mislead the jury. Accord, Commonwealth v. Juvenile, 412 N.E.2d at 344; Hurd, 432 A.2d at 96-97; Beachum, 643 P.2d at 253-254; and Giannelli, supra at 1246. To satisfy this burden, we approve the following language from Hurd:
[T]he party seeking to introduce hypnotically refreshed testimony has the burden of establishing admissibility by clear and convincing evidence. We recognize that this standard places a heavy burden upon the use of hypnosis for criminal trial purposes. This burden is justified by the potential for abuse of hypnosis, the genuine likelihood of suggestiveness and error, and the consequent risk of injustice. The hypnotically refreshed testimony must not be used where it is not reasonably likely to be accurate evidence.
432 A.2d at 97; accord, Beachum, 643 P.2d at 254; cf. Giannelli, supra, at 1246. In meeting the clear and convincing evidence standard, a party advocating the admission of such testimony should attempt to satisfy certain criteria aimed at safeguarding the reliability of the hypnosis process. The nearer the hypnotic session comes to meeting these suggested safeguards, the more reliable and less suggestive the hypnotic session. Use of these extensive safeguards can minimize the gravity of objections to admissibility. Cf. Safeguards, supra, at 211; see generally Beachum, 643 P.2d at 253; Hurd, 432 A.2d at 96; State v. Glebock, 616 S.W.2d 897 (Tenn.Ct.Cr.App. 1981). We approve some, but not all of the Hurd safeguards. See also Key v. State, No. AI-480 (Fla. 1st DCA, February 8, 1983).
Returning to the first three problem areas that are inherent in the process of hypnosis: hypersuggestiveness, hypercompliance, and confabulation, we find that commentators generally approve the following safeguards to reduce the potentiality of prejudice.[22]First, a neutral and detached hypnotist should be employed. By using such an individual, the appearance of prejudice concomitant with use of a police officer/hypnotist, as in the case at bar, will be substantially abated. Use of a police officer/hypnotist is not per se a compelling reason for a court to suppress automatically as evidence the fruits of a hypnotic session on prejudicial grounds, but the use of such officer in that capacity should be avoided if other professionals are available to conduct the session.
Courts and commentators alike that have adopted or advocated various safeguards are united in requiring that hypnosis be performed by either a trained mental health expert,[23] psychiatrist, or psychologist.[24] We do not go so far as to make this a requirement, but the advantage of using a professional, such as a psychiatrist or psychologist, should be readily apparent. Such professionals should be able to qualify as experts without difficulty and competent to testify about the hypnosis method utilized, as well as the use of hypnosis in general. Beachum, 643 P.2d at 253; Hurd, 432 A.2d at 96. This is due in part to the fact that the fields of psychiatry and psychology have long embraced hypnosis as a medical tool for therapy. See Dilloff, supra, at 3. So too, hypnotized "individuals often are able to recall a good deal more while talking to a psychiatrist or psychologist than when they are with an investigator, ... ." Orne, supra, at 336; cf. Hurd, 432 A.2d at 96.
A second safeguard involves the location of the hypnosis session. Ideally, the session *92 should be conducted at an independent location, such as a doctor's office, free from a coercive or suggestive atmosphere. Dilloff, supra, at 8. Third, as was the situation in this case, only the hypnotist and the witness should be present during hypnosis. Beachum, 643 P.2d at 254, Hurd, 432 A.2d at 97; People v. Lucas, 107 Misc.2d 231, 435 N.Y.S.2d 461, 464 (Sup.Ct. 1980). "This is important, because it is all too easy for observers to inadvertently communicate to the subject what they expect, what they are startled by, or what they are disappointed by." Orne, supra, at 336. This is not to say that the prosecution, defense, police investigators, or other interested parties should not be permitted to observe the hypnosis session. We believe that interested parties should be encouraged to observe the session, since such a procedure will allow a party opponent the opportunity to note any potential problems with the procedure. These problems may be brought to the trial court's attention at a later time. Dilloff, supra, at 8. However, as Dr. Orne suggests, parties other than the hypnotist and the hypnotized witness should only be permitted to view the session through a one-way mirror or on a television monitor. Orne, supra, at 336.
A recommended fourth safeguard proposes that the subject, before the hypnosis session, be examined by the hypnotist in an effort to elicit every possible detail that the witness recalls concerning the crime. This procedure should be recorded in some fashion, as is more fully explained under the sixth safeguard, infra.
Fifth, prior to being hypnotized, the witness should be examined by the hypnotist to ascertain whether the witness suffers from any mental or physical disorders that might affect the results of the session. Lucas, 435 N.Y.S.2d at 464. Here again, if the hypnotist is a trained expert, such as a psychiatrist, he or she will be more competently able to conduct such an examination.
As a sixth safeguard, we consider it highly desirable that some type of record of the actual session be preserved. Several objectives will be accomplished by utilizing this procedure: First, after hypnosis it will be possible to document that a witness has "not been implicitly or explicitly cued pertaining to certain information which might then be reported for apparently the first time by the witness during hypnosis." Orne, supra, at 336. Second, should recall testimony be gained by a hypnosis session that is so unreliable as to require exclusion from a court proceeding, a careful record of all pre-hypnosis details recalled by the witness will be documented, preferably by videotape. We see no valid reason for barring a witness' pre-hypnosis recollections from evidence, merely because the witness has been later hypnotized. Additionally, not even jurisdictions which have barred the admission of testimony from a witness who has been hypnotized have gone so far as to exclude per se, pre-hypnotic recollections. See State ex rel. Collins, 644 P.2d at 1295-1297; State v. Palmer, 210 Neb. 206, 313 N.W.2d 648, 655 (1981); State v. Wallach, 110 Mich. App. 37, 312 N.W.2d 387 (1981); and State v. Koehler, 312 N.W.2d 108 (Minn. 1981).
By having such a record available, a party opponent might also be able to muster expert witnesses for the purpose of developing any possible flaws in the manner in which the hypnosis was performed. The court, moreover, would be able to scrutinize the session. Although we do not go so far as to require that the session and pre-session examination be videotaped, as did the New York court in Lucas, 435 N.Y.S.2d at 464, we strongly suggest that a videotape system be utilized.[25] After all, the videotape *93 system is the only method by which visual cues can be documented. Orne, supra, at 336; Diamond, supra, at 339. Absent use of a videotape, an audio tape recording or a written transcript of the proceedings is an alternative. Accord Beachum, 643 P.2d at 253-254; Hurd, 432 A.2d at 97. Finally, in determining the admissibility of hypnotically-induced-recall-testimony, if videotaping of the hypnosis session is not employed, the manner in which the session was conducted becomes less demonstrably reliable and more inherently suspect.
A seventh safeguard relates to the means by which the interview is conducted. The hypnotist should avoid reassuring remarks that might assist in stimulating the process of confabulation. The hypnotist should merely relate details generally to the hypnotized subject, leaving the witness free to present a narrative that will fill in the details of previous observations of the crime. Dilloff, supra, at 8. Free narrative recall under hypnosis will produce a higher degree of accurate information. State ex rel. Collins, 644 P.2d at 1291.
Eighth, in weighing the reliability of the session and its results, the court should carefully consider whether there is independent "evidence corroborative of or contradictory to statements made during the trance... ." Lucas, 435 N.Y.S.2d at 464. An example of this type of situation exists in the case at bar. We find the bank teller's hypnotically-induced-recall-testimony by which she identified the appellant as the individual who passed the check and received cash for it jibes with other factors in this case. For example, a handwriting expert implicitly corroborated such testimony by determining that appellant forged the check which was later passed to the teller. Additionally, a deposit receipt from the transaction was found in a jacket belonging to appellant's accomplice. Circumstantially, this evidence strongly suggests that the bank teller's identification of the appellant was reliable and not the product of confabulation.
Dependent upon the degree to which the eight foregoing safeguards can be satisfied, the trial judge can weigh the probative value of the testimony to see if it is substantially outweighed by dangers of unfair prejudice, or by the fact that it may mislead the jury. § 90.403, Fla. Stat. Assuming that the trial judge permits the testimony to be introduced into evidence, there are two mandatory safeguards that we find to be necessary. Because the witness who has been hypnotized may have an almost unshakeable belief in the correctness of details recalled during the hypnotic trance, the court should give great leeway to a party opponent in cross-examining the witness. "As a practical matter, counsel challenging testimony elicited through pretrial hypnosis ... should apply techniques similar to those used to attack present recollection refreshed. The most advantageous approaches are to discredit the accuracy of testimony or to question the hypnotic procedure itself through the cross-examination of experts." Hypnosis and Criminal Law, supra, at 678; cf. Chapman v. State, 638 P.2d 1280, 1284 (Wyo. 1982).
An additional required safeguard should be implemented in the form of a cautionary jury instruction warning the jury of the potential influence hypnosis may have on a witness. Hypnosis and Criminal Law, supra, at 678; see also Admissibility of Testimony Influenced by Hypnosis, supra, 67 Va.L.Rev. at 1215 n. 79; cf. Giannelli, supra, at 1238 n. 310. The instruction should be given by the court prior to the time that hypnotically-induced-recall-testimony is presented and again at the time that the jury is charged. At the minimum, the instruction should carefully advise the jury not to place unduly great weight on the witness' recall testimony, and that the process of hypnosis merely assists a witness in recalling an event. It does not act as a magic truth serum, nor does it guarantee an accurate recall of the details *94 of the crime. We find that it was error for the lower court to deny the appellant's request for a cautionary jury instruction, although the particular instruction as requested was only a partially complete statement of the law.[26]
Appellant's convictions on the charges of uttering a forged instrument and grand theft are reversed and remanded for further consistent proceedings. Appellant's conviction on the charge of forgery is affirmed.[27]
McCORD, GUYTE P., Jr. and SHAW, LEANDER J., Jr., Associate Judges, concur.
NOTES
[1] Section 812.022(2) states:

Proof of possession of property recently stolen, unless satisfactorily explained, gives rise to an inference that the person in possession of the property knew or should have known that the property had been stolen.
[2] § 831.02, Fla. Stat. (1979).
[3] § 812.014, Fla. Stat. (1979).
[4] See Crash Memory Hazy: Hypnosis Brings It Out, 68 A.B.A.J. 900 (1982); Cowen, Hypnosis Is No Aid to Justice, Christian Science Monitor, Apr. 14, 1982, at 20, col. 1; "The Amazing Kreskin" Says Hypnotism Is a Gimmick That Belongs Onstage, Not in Court, People Weekly, Jan. 25, 1982, at 73-75; and Orne, The Use and Misuse of Hypnosis In Court, 27 International Journal of Clinical and Experimental Hypnosis 311 (1979) [hereinafter: Orne].
[5] See, e.g., Note, Safeguards Against Suggestiveness: A Means for Admissibility of Hypno-Induced Testimony, 38 Wash. & Lee L.Rev. 197 (1981); Note, The Admissibility of Testimony Influenced by Hypnosis, 67 Va.L.Rev. 1203 (1981); Comment, Hypnosis  Its Role and Current Admissibility in the Criminal Law, 17 Willamette L.Rev. 665 (1981) [hereinafter: Hypnosis and Criminal Law]; Diamond, Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness, 68 Calif.L.Rev. 313 (1980) [hereinafter: Diamond]; and Dilloff, The Admissibility of Hypnotically Influenced Testimony, 4 Ohio N.U.L.Rev. 1 (1977) [hereinafter: Dilloff]; see also Annot., 9 A.L.R. 4th 354 (1981); Annot., 50 A.L.R.Fed. 602 (1980); and Annot., 92 A.L.R.3d 442 (1979).
[6] Hypnosis has been used in a number of sensational criminal cases, primarily for investigative purposes. In the 1976 California Chowchilla kidnapping case, a bus driver was able to recall a key license plate number on a getaway van after having been hypnotized. See Diamond, supra note 5, at 316 n. 7(f); Admissibility of Testimony Influenced by Hypnosis, supra note 5, at 1203 n. 3. Hypnosis was used in the Boston Strangler case, see Admissibility of Testimony Influenced by Hypnosis, id.; the recent Los Angeles Hillside strangler murder case; and the abduction of NATO Commander General James Dozier by Red Brigade terrorists in Italy. People Weekly, supra note 5, at 74. The defense utilized hypnosis to attempt to establish the diminished capacity of Senator Robert Kennedy's killer, Sirhan Sirhan. See Diamond, supra note 5, at 315 n. 7(c).
[7] It is difficult to formulate a precise definition that accurately conveys what is meant by the term hypnosis. However, hypnosis is generally viewed as "a sleeplike state whereby response to stimuli is more easily achieved than in a waking state... . Categorized as a state of heightened concentration, hypnosis is achieved by creating a passiveness in the subject, usually by employing eye fatigue. The subject, with increased receptivity to instruction, is guided into a trance-like state through a series of suggestions from the hypnotist." Commonwealth v. Nazarovitch, 496 Pa. 97, 436 A.2d 170, 173 (1981); see also State v. Mack, 292 N.W.2d 764, 765 (Minn. 1980); State v. Mena, 128 Ariz. 226, 624 P.2d 1274, 1276 (1981).
[8] The problems resulting from a leading question were demonstrated in a 1979 study in which William H. Putnam hypnotized a number of individuals, asking them to recall certain events that they had observed on a recently viewed videotape recording. Putnam found that his leading questions elicited more incorrect answers from subjects under hypnosis than from subjects not under hypnosis. Admissibility of Testimony Influenced by Hypnosis, supra note 5, at 1212.
[9] Dr. Martin T. Orne, an expert in the field of hypnosis who has testified at numerous trials on the subject, has confirmed this by noting that verbalizations by the hypnotist such as "`Good,' `Fine,' `You are doing well,' and so on" merely exacerbate the problem by reassuring the hypnotized subject that he is pleasing the hypnotist and to continue on. Orne, supra note 4, at 326.
[10] This interplay has also concerned the Pennsylvania and New Jersey Supreme Courts to some degree. See Nazarovitch, 436 A.2d at 174 and Hurd, 432 A.2d at 93.
[11] One of the most graphic examples of confabulation occurred in People v. Lopez, 110 Cal. App.3d 1010, 168 Cal. Rptr. 378 (1980). A witness underwent four pretrial hypnotic sessions, but the hypnotist reported to the court that although the witness had been in a trance, the entire recollection of the witness was a total fabrication. The Lopez court accepted this explanation and found that hypnosis had been useless in refreshing the witness' memory.
[12] As noted by the Pennsylvania Supreme Court: "Pre-hypnosis uncertainty becomes molded, in light of additional recall experienced under hypnosis into certitude, with the subject unaware of any suggestions that he acted upon any confabulation in which he engaged." Nazarovitch, 436 A.2d at 174; Mack, 292 N.W.2d at 769; see also Hypnosis and Criminal Law, supra note 5, at 672 n. 43.
[13] The degree to which posthypnotic source amnesia can affect a witness is demonstrated by a factor related to the trial of Sirhan Sirhan, the convicted killer of Senator Robert Kennedy. See People v. Sirhan, 7 Cal.3d 710, 102 Cal. Rptr. 385, 497 P.2d 1121 (1972), cert. denied, 410 U.S. 947, 93 S.Ct. 1382, 35 L.Ed.2d 613 (1973). Professor Bernard Diamond of the University of California, Berkeley, hypnotized Sirhan Sirhan in preparation for trial. The hypnosis session was observed by a number of reliable observers. He was placed into several very deep trances and given certain posthypnotic suggestions which he later acted out. However, to this day Sirhan Sirhan denies having ever been hypnotized. See Diamond, supra, at 334-335.
[14] Our research indicates that almost all courts barring the use of hypnotically-induced-recall-testimony have done so by applying the Frye rule. There are a few deviations from this trend. See, e.g., People v. Diaz, 644 P.2d 71 (Colo. App. 1982) (Frye not applied but hypnotically-induced-recall found inadmissible); Strong v. State, 435 N.E.2d 969 (Ind. 1982) (Frye not applied; hypnosis inherently unreliable and therefore not probative); Hurd, 432 A.2d 86 (Frye inapplicable to hypnotically influenced testimony, but testimony admissible because relevant); and People v. Beachum, 97 N.M. 682, 643 P.2d 246 (Ct.App. 1981) (follows and quotes Hurd).
[15] For example the test has been applied to different techniques in People v. Kelly, 17 Cal.3d 24, 130 Cal. Rptr. 144, 549 P.2d 1240 (1976) (voice-print analysis); United States v. Distler, 671 F.2d 954 (6th Cir.1981) (gas chromatograph test for matching oil samples); People v. Anderson, 637 P.2d 354 (Colo. 1981) (polygraph); Phillips v. Jackson, 615 P.2d 1228 (Utah 1980) (H.L.A. paternity test); People v. Baynes, 58 Ill.Dec. 819, 88 Ill.2d 225, 430 N.E.2d 1070 (1981) (polygraph); People v. Alston, 79 Misc.2d 1077, 362 N.Y.S.2d 356 (1974) (bloodstain cell analysis); State v. Linn, 93 Idaho 430, 462 P.2d 729 (1969) (truth serum), and Brooke v. People, 139 Colo. 388, 339 P.2d 993 (1959) (paraffin tests).
[16] See, e.g., State ex rel. Collins, 132 Ariz. 180, 644 P.2d 1266 (1982); Shirley, 641 P.2d 775 (Calif.); Nazarovitch, 436 A.2d 170 (Pa.); Mack, 292 N.W.2d 769 (Minn.); Collins v. State, 52 Md. App. 186, 447 A.2d 1272 (1982); Gonzales, 310 N.W.2d 306 (Mich.); and State v. Palmer, 210 Neb. 206, 313 N.W.2d 648 (1981); People v. Hughes, 88 A.D.2d 17, 452 N.Y.S.2d 929 (1982).
[17] The relevancy approach is preferred over the Frye rule because of problems inherent in the application of Frye and due to policy reasons. See Giannelli, supra. One of the major criticisms directed against applying the Frye rule to a given scientific technique is that it would indiscriminately bar the admissibility of such evidence despite whether it meets the twin tests of logical and legal relevance. For example, as pointed out by Professor Giannelli, a rigid application of Frye would require a court to await the passage of time until such time as a new test or procedure has been developed to the point that the test or procedure has been developed to the point that the test or procedure has become "generally accepted." This creates a "cultural lag" during the technique's development, requiring that relevant evidence which might be demonstrated to be completely reliable must be excluded from consideration. See Giannelli, supra, at 1223 nn. 201 & 202; contrast United States v. Addison, 498 F.2d 741, 743-744 (D.C. Cir.1974). Plainly, the Frye rule engenders an impediment to the admissibility of reliable evidence without considering the cost to society. Admissibility of Testimony Influenced by Hypnosis, supra, 67 Va.L.Rev. at 1214, n. 77; see also Hurd, 432 A.2d at 94.
[18] See Speights v. State, 414 So.2d 574, 578 (Fla. 1st DCA 1982); Ivester v. State, 398 So.2d 926, 930 (Fla. 1st DCA 1981), rev. denied, 412 So.2d 470 (Fla. 1982).
[19] One might well ask, in a jurisdiction that has previously adopted Frye, whether the rule survives a subsequent enactment of an evidence code embracing the "relevancy" test. Sections 90.401-.403, Florida Statutes, are patterned after Rules 401, 402 and 403 of the Federal Rules of Evidence, 28 U.S.C. It is well settled that if a state statute is patterned after the language of its federal counterpart, the statute will take the same construction in Florida courts as its prototype has been given insofar as such construction comports with the spirit and policy of the Florida law relating to the same subject. Pasco County School Board v. Florida Public Employees Relations Commission, 353 So.2d 108, 116 (Fla. 1st DCA 1977). Unfortunately the answers received from the federal sector are not uniform. Some courts assume that the Frye test survived the 1975 adoption of the Federal Rules of Evidence, see, e.g., United States v. Tranowski, 659 F.2d 750, 756 (7th Cir.1981); United States v. Kilgus, 571 F.2d 508, 510 (9th Cir.1978); United States v. Brown, 557 F.2d 541, 556 (6th Cir.1977); United States v. McDaniel, 538 F.2d 408, 412 (D.C. Cir.1976). At least one other federal court does not. United States v. Williams, 583 F.2d 1194, 1197-1200 (2nd Cir.1978); cert. denied, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979). However, apparently no federal court has directly faced nor analyzed the issue. Two state cases have held that state rules of evidence, patterned after the federal rules, displace Frye. State v. Williams, 388 A.2d 500 (Me. 1978); State v. Dorsey, 88 N.M. 184, 539 P.2d 204 (1975).
[20] Hypnosis cannot be equated with polygraph testing and truth serums. As one writer recently explained:

[I]t [hypnosis] is conceptually different from polygraph testing and narcoanalysis. The last two procedures function as truth elicitors, and properly have nothing to do with memory retrieval. Conversely, hypnosis is a means of memory retrieval and cannot be classified as a truth elicitor. To classify hypnosis with polygraph testing and narcoanalysis erroneously implies that hypnosis can produce truth. This gives rise to the danger that trial courts will label hypnosis as a scientific means of ensuring truth, thereby leading the jury to attribute "uncritical and absolute reliability" to hypnosis without evaluating its flaws.
Hypnosis and Criminal Law, supra note 5, at 673 (footnote omitted); see also People v. Beachum, 643 P.2d at 251; Orne, supra note 4, at 313 n. 5; Dilloff, supra note 5, at 22.
[21] The balancing test of legal relevancy has been advocated by various commentators. See Giannelli, supra, at 1239; Orne, supra note 4; and Admissibility of Testimony Influenced by Hypnosis, supra note 5, at 1220. The balancing test was recently severely criticized in State ex rel. Collins, 644 P.2d at 1285, because of the "danger of conflicting decisions" as to the admissibility of hypnotically-induced-recall-testimony and due to the "consumption of trial resources." Yet, the State ex rel. Collins criticism begs the point because all forms of evidence in all cases are subject to trial court review for legal relevance. The court seems to be opposed to a test for legal relevance by its argument.
[22] Many of the safeguards applicable to the process of hypnosis are derived from the position taken by Dr. Martin T. Orne, who is one of the foremost hypnotists. His safeguards are included in his article on the use of hypnosis in court. See Orne, supra note 4, at 335-336.
[23] People v. Lucas, 107 Misc.2d 231, 435 N.Y.S.2d 461, 464 (Sup.Ct. 1980); see also People v. Smrekar, 68 Ill. App.3d 379, 24 Ill.Dec. 707, 385 N.E.2d 848, 855 (1979).
[24] Beachum, 643 P.2d at 253-254; Hurd, 432 A.2d at 96-97; Orne, supra note 4, at 335-336.
[25] Videotaping has come into vogue in the last few years, and numerous articles have been written about the advantages and disadvantages of the technique. See, e.g., Raburn, Videotapes in Criminal Courts: Prosecutors on Camera, 17 Crim.L.Bull. 405 (1981); Armstrong, The Criminal Videotape Trial: Serious Constitutional Questions, 55 Ore.L.Rev. 567 (1976); Doret, Trial by Videotape  Can Justice be Seen to be Done?, 47 Temple L.Q. 228 (1974); Note, Videotape as a Tool in the Florida Legal Process, 5 Nova L.J. 243 (1981). It should be noted that videotapes are not only probative, but admissible in Florida criminal proceedings on much the same basis as still photographs. Paramore v. State, 229 So.2d 855, 859 (Fla. 1969), vacated as to death sentence only, 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 751 (1972). See also, 3 Scott, Photographic Evidence §§ 1294, 1333 (2nd ed. 1969).
[26] The appellant requested the following jury instruction:

The court allowed into evidence testimony that was recalled or induced through the aid or use of hypnosis, the court instructs you to consider that testimony and give it the weight and credibility you feel it deserves since the court cannot vouch for its reliability. The court, however, admitted the testimony into evidence because it was relevant to the issue at hand.
[27] Not raised in this appeal nor addressed in this opinion is the issue of an unduly suggestive identification violative of principles of due process. See Hurd, 432 A.2d at 97-98.